Matthew D. Ruyak (SBN 184772)
Interim City Attorney
CITY OF SACRAMENTO
Office of the City Attorney
915 I Street, 4th Floor
Sacramento, CA. 95814
Telephone: (916) 808-5346

Yosef Peretz (SBN 209288)
PERETZ & ASSOCIATES
22 Battery Street, Suite 200
San Francisco, California 94111
Telephone: (415) 732-3777
Facsimile:  (415) 732-3791

Joel Liberson (SBN 164857)
TRIAL & APPELLATE RESOURCES, P.C.
3655 Torrance Blvd., Third Floor
Torrance, CA 90503
Telephone:  (917) 848-3218

Robert S. Peck (*pro hac vice forthcoming*)
CENTER FOR CONSTITUTIONAL LITIGATION, PC
50 Riverside Boulevard, Suite 12A
New York, NY 10069
Telephone:  (646) 649-5575

Attorneys for Plaintiff CITY OF SACRAMENTO

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SACRAMENTO, a municipal Corporation,<br><br>                          Plaintiff,<br><br>vs.<br><br>WELLS FARGO & CO., and WELLS FARGO BANK, N.A.,<br><br>                          Defendants. | Civil Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.    This case addresses one of the products at issue in the infamous "Gr-Eight"[1] cross-selling program — discriminatory mortgages sold by the Community Bank of Wells Fargo to minority borrowers in Sacramento who otherwise qualified for less expensive loans than similarly situated white borrowers.  By engaging in a long-standing pattern and practice of discriminatory lending, Wells Fargo has inflicted significant monetary and non-monetary injuries upon the City of Sacramento.

2.    The conduct the City seeks to remedy is embedded in a larger context, on the one hand, of a history of redlining and reverse redlining in Sacramento, and on the other, the specific Wells Fargo culture and total breakdown of appropriate internal controls that should have prevented not only the discriminatory lending here, but all of the improper conduct within the Community Bank now under scrutiny by numerous courts, agencies, and regulators.

3.    The Federal Reserve System recently undertook an Enforcement Action against the Bank, which underscores the sweeping nature of Wells Fargo's compliance failures and the toxic environment created within the Community Bank to cross-sell customers at least eight products, including mortgage loans.  These deficiencies exist to this very day.[2]

4.    One particularly egregious component of Wells Fargo's dysfunctional risk management and internal control environment is the Bank's Audit Services function (Internal Audit), which is charged with evaluating the effectiveness of the governance, risk management, and control processes across the enterprise."[3]  If Internal Audit had performed its responsibilities

---

[1] The "Gr-eight" initiative was part of a Wells Fargo initiative that pushed employees to increase the average number of financial products each customers held with the Bank and resulted in the firing of 5,300 employees. Maryam Kouchaki, "How Wells Fargo's Fake Accounts Scandal Got So Bad," FORTUNE (Sept. 15, 2016), available at http://fortune.com/2016/09/15/wells-fargo-scandal/ (last visited Feb. 18, 2018).

[2] https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a1.pdf

[3]    See    https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2013-annual-report.pdf?https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2013-annual-report.pdf;
https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf?https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf;  https://www08.wellsfargomedia.com/assets/pdf/about/investor-

properly, Wells Fargo's long-standing pattern and practice of issuing discriminatory mortgages to minority borrowers within Sacramento would have been curtailed long ago.

## II.    NATURE OF THE ACTION

5.     Plaintiff City of Sacramento ("Sacramento" or the "City") brings this action against Wells Fargo & Co., Inc. and Wells Fargo, N.A. (collectively, "Wells" or the "Bank") for the economic and noneconomic harm suffered by the City as a result of the Bank's longstanding, unbroken policy and practice of steering minority borrowers in Sacramento into mortgage loans offered on "discriminatory" terms (defined herein as terms that have higher costs and risk features than more favorable and less expensive loans for which the borrower was eligible and which are regularly issued to similarly situated white borrowers) and for its policy of refusing to extend credit to minority borrowers who desired to refinance the more expensive loans they previously received when such credit was extended to white borrowers.

6.     The City brings this suit pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq*., and the California Fair Employment and Housing Act ("FEHA"), California Government Code ("Gov't Code") §12900, *et seq.*, to seek redress for injuries directly caused by Wells Fargo's[4] pattern or practice of illegal and discriminatory mortgage lending.

7.     Specifically, Sacramento seeks injunctive relief and damages for the injuries directly caused by (1) the origination of mortgage loans on discriminatory terms in minority neighborhoods and to minority borrowers that are the result of Wells Fargo's unlawful and discriminatory lending practices, and (2) the Bank's subsequent refusal to extend credit to

---

relations/annual-reports/2015-annual-report.pdf?https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2015-annual-report.pdf;          https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/2016-annual-report.pdf?https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2016-annual-report.pdf.

[4] Defendants collectively are referred to as "Wells Fargo," including: Wells Fargo & Co., and Wells Fargo Bank, N.A. Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through: Wells Fargo Financial, Wells Fargo Funding, Inc., Wachovia Mortgage, FSB, Wachovia Bank, N.A., Wachovia Mortgage Co., World Savings Bank, FSB, American Mortgage Network, Inc., and Home Services Lending, LLC (hereinafter referred to as the "Acquired Entities").

minority borrowers seeking to refinance previously issued unnecessarily expensive loans. These illegal practices suppressed property values in minority and low income communities in Sacramento reduced the City's property tax revenues, and increased the cost of providing municipal services such as police, fire fighting and code enforcement, required the City to divert resources intended for other programs, as well as neutralizing and increasing costs of pursuing fair housing policies and programs and providing housing counseling and other housing-related services utilizing resources of the City of Sacramento.

8.      The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination. Wells Fargo's policies and practices identified herein were not justified by business necessity or legitimate business interests. There were less costly alternatives available to Wells Fargo that would have achieved the same business goals as were achieved by these policies and practices without generating the same discriminatory results. For example, Wells Fargo could have charged white borrowers with the same risk profiles as minority borrowers the same rates and not violated the law.  With respect to disparate treatment, Wells Fargo knowingly repeated and thus ratified the same discriminatory policies year after year, and went further in targeting minority customers.

9.      While Wells Fargo has adapted to changing market conditions necessitated by enhanced public scrutiny of its mortgage lending practices, one issue has remained constant since at least 2004: Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of steering minority borrowers in Sacramento into higher cost or more onerous mortgage loans with discriminatory terms when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers. This unlawful pattern and practice continues through the present and has not terminated.   Therefore, the operative statute of limitations governing actions brought pursuant to the FHA and FEHA has not commenced to run.

10.      Major banks, including Wells Fargo, have a long history of engaging in redlining[5] throughout Sacramento. These lending practices resulted in entire neighborhoods and racial and

---

[5] Redlining is the practice of denying credit to particular neighborhoods based on race.

ethnic groups being denied access to credit and homeownership, and contributing to the high rates of poverty and lack of wealth accumulation in these communities.

11.    In the late 1990s, Wells Fargo adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products as compared to the mortgage loans issued to similarly situated white borrowers. This practice of issuing exploitative loan products in minority communities has come to be known as "reverse redlining." Both redlining and reverse redlining have been deemed to violate the FHA by federal courts throughout the country. As former Federal Reserve Chairman Ben Bernanke acknowledged, these twin evils of mortgage discrimination "continue to have particular significance to mortgage markets."[6]

12.    Wells Fargo's discriminatory lending practices knowingly place vulnerable, underserved borrowers in loans they cannot afford. The practices maximize Wells Fargo's profits without regard to the borrower's best interests, the borrower's ability to repay, or the financial health of underserved minority neighborhoods, or the costs and injuries to the City of Sacramento. Moreover, Wells Fargo has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market.

13.    Wells Fargo's discriminatory misconduct has also directly caused an excessive and disproportionately high number of foreclosures, particularly in minority and low-income neighborhoods in Sacramento. These foreclosures often occur when a minority borrower who previously received a discriminatory loan seeks to refinance the loan, only to discover that Wells Fargo refuses to extend credit at all, or will only refinance on less favorable terms compared to what the Bank offers to refinance similar loans issued to white borrowers. The inevitable and direct consequence of the combination of issuing unnecessarily expensive or inappropriate loans, and then refusing to refinance the loans, is foreclosure.

14.    These discriminatory patterns and practices have directly caused an excessive and disproportionately high number of foreclosures on the loans it has made to minorities in the City

---

[6] Remarks by then Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia, *Challenges in Housing and Mortgage Markets*, at 10 (Nov. 15, 2012), *available at* www.federalreserve.gov/newsevents/speech/bernanke 20121115a.htm.

of Sacramento. In particular, as a result of these patterns and practices, foreclosures on loans originated by Wells Fargo are concentrated in neighborhoods with higher proportions of minorities.

15.     Wells Fargo would have had comparable foreclosure rates in minority and white neighborhoods if it was properly and uniformly applying responsible underwriting practices. Wells Fargo possesses sophisticated underwriting technology, analytic tools, data, and access to reports that allow it to predict with precision the likelihood that it had improperly issued a more expensive loan, as well as the likelihood the loan would result in delinquency, default, or foreclosure.[7] And if that was not sufficient, the Bank had branch offices located in Sacramento and knew, or should have known, of the adverse consequences of its lending misconduct to minority borrowers and the City regardless of whether the Bank subsequently sold the loan or servicing rights to a third party. Consequently, the Bank's improper issuance of more expensive loans to minority borrowers and the resulting injuries suffered by the City were not the result of random events.

16.     The data on Wells Fargo loans in the City of Sacramento reveals a widespread pattern or practice of discrimination.  For example, a regression analysis that *controls for credit history* and other factors demonstrates that African-American Wells Fargo borrowers were 2.043 times more likely to receive a high-cost or high-risk loan[8] than a white borrower. Latino borrowers were 1.444 times more likely to receive a high-cost or high-risk loan than comparable white borrowers. The regression analysis confirms that African-Americans with FICO scores over 660 are 2.820 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower, and a Latino borrower 1.767 times more likely.

---

[7] The scope of Wells Fargo's risk analysis policies and practices is set forth in detail throughout numerous Annual Reports, including, for example, the Bank's 2015 Annual Report, *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2015-annual-report.pdf and the Bank's 2016 Annual Report, available at https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2016-annual-report.pdf.

[8] As used here, "high-cost or high-risk loans" are loans with one or more of the following characteristics or types: loans that are rate-spread reportable under the Home Mortgage Disclosure Act, subprime loans, negative amortization loans, "No-Doc" loans, balloon payments, and/or "interest only" or teaser loans that also carry a prepayment penalty.

17.     This is not the first challenge to Wells Fargo's discriminatory lending practices. To date, successful discriminatory lending actions alleging conduct similar to that alleged herein have been brought against Wells Fargo by the City of Baltimore, the City of Memphis, the Department of Justice, and the Federal Reserve Bank. The Federal Reserve levied an $85 million penalty against Wells Fargo, representing the largest penalty it has assessed in a consumer protection enforcement action.

18.     The Department of Justice's Civil Rights Division determined that mortgage brokers who generated loan applications through Wells Fargo's wholesale channel, and were granted broad pricing discretion by Wells Fargo, had charged higher fees and rates to tens of thousands of minority borrowers across the country than they had to white borrowers who posed the same credit risk—selling what Wells Fargo employees in Baltimore referred to as "ghetto loans."

19.     According to former Federal Reserve Chairman Ben Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them. Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well. Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime. Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[9]

20.     The discriminatory lending patterns and practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history." It is well established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of the overall wealth for minorities.[10] As Chairman Bernanke explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income

---

[9] Bernanke, *supra* note 6.

[10] Robert Schwemm & Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 Harv. C.R.-C.L. L. Rev. 375, 382 (2010).

and minority communities in the past 15 years or so have been reversed."[11] The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African-Americans."[12]

21.     In addition to directly causing injuries to minority borrowers who received these discriminatory loans, Wells Fargo's discriminatory pattern and practices at issue here have caused numerous injuries directly to the City of Sacramento, including, without limitation: (a) suppressed property tax revenues resulting from declining property values of both the foreclosed properties and those properties in close proximity to the foreclosed properties; (b) the cost of increased municipal services for these properties, many of which are incurred even before foreclosure; and (c) wasteful or neutralized spending and allocation of resources by the City to achieve fair housing, while undermining the City's efforts to promote fair non-discriminatory housing opportunities to its citizens, as well as the benefits of living in an integrated community.

22.     The widespread economic and non-economic injuries throughout the City directly caused by the Bank's discriminatory mortgage lending policies and practices were known, recklessly ignored, or knowable to the Bank through a variety of analytical tools and published reports available to the Bank had it not turned a blind eye.  The Bank's wrongful conduct herein alleged directly caused injury to the City because Defendants issued discriminatory loans that directly caused foreclosures.  As detailed below, these foreclosures damaged the City's stated mission of providing fair housing to its residents, in the form of decreased property tax revenue, and in the form of increased expenditures for municipal services.   Thus, the City is entitled to recover the injuries that are directly attributable to the Bank's conduct.

23.     This suit seeks to recoup the damages sustained by the City from Wells Fargo's discriminatory mortgage lending practices and enjoin the continuation of these discriminatory patterns and practices.  Wells Fargo is, unfortunately, a recidivist corporate actor, and, just as it is being held accountable for its other financial improprieties that derive from the same corporate culture, including its unauthorized account creation scheme currently and recently in the news,

---

[11] Bernanke, *supra* note 6.

[12] Charles Nier III & Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 Temple L. Rev. 941, 942 (2011).

so too should it be accountable for this functionally similar approach to profits over compliance, in this case, at the expense of minorities–and at great cost to the City.

## III.    PARTIES

24.    Plaintiff City of Sacramento is a municipal corporation with culturally diverse and growing community that boasted an estimated population of 495,234 as of July 1, 2016 and is organized pursuant to Article XI of the California Constitution. It provides the usual variety of services to its residents and visitors as do other municipalities, including police and fire services.

25.    The City has a long history of promoting and seeking to maintain a diverse, stable, and integrated community, which provides a litany of benefits for its residents and serves to attract employers to the City. Among the benefits are a greater richness and variety to the city's life and increased innovation which leads to economic growth, improved access to jobs, enhanced public safety, and the prevention of stagnation. These objectives are achieved through the active involvement of the City's elected officials and numerous City Agencies and Departments, many of which are referenced in Sacramento's 2013-2021 Housing Element Report, which serves as the City's strategic housing plan and reinforces the City's commitment to meet the housing needs of all its residents.[13]  These include the Community Development Department and the Code Enforcement Division, among others.  The City expends significant resources to promote housing programs and combat discrimination.

26.    Wells Fargo & Company is a nationwide, diversified, financial services company. Upon information and belief, its corporate headquarters is located in San Francisco, California. It is the parent company of Wells Fargo Bank, N.A.

27.    Wells Fargo Bank, N.A. is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in South Dakota. It maintains multiple offices in the State of California and the City of Sacramento for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

28.    The Defendants in this action are, or were at all relevant times, subject to California state laws governing fair lending, including FEHA, which prohibits financial

---

[13]http://www.cityofsacramento.org/-/media/Corporate/Files/CDD/Planning/Long-Range/Housing-Programs/SacHEU_CompleteHE_FINAL_2013-12-17_web.pdf?la=en

institutions from discriminating on the basis of race and national origin in providing financial assistance for the purchase of housing, California Government Code § 12955(e); and makes discriminating on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions a violation of California Government Code § 12955(i).

29.     The Defendants in this action are or were businesses that provide financial assistance for the purchase of housing and engage in residential real estate-related transactions in the City of Sacramento within the meaning of FEHA.

30.     Defendants acquired residential home loans sold by or through the Acquired Entities. Through these loan acquisition agreements and arrangements, Defendants acquired the liabilities associated with these loans, including, without limitation, liabilities for violations of the FHA, from the Acquired Entities.

31.     Upon information and belief, the City alleges that each of the Defendants was and is an agent of the other Defendants. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal. Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable for the acts and omissions of its agents.

## IV.    JURISDICTION

32.     This Court has original jurisdiction over the City's claims because it is based on a federal question pursuant to 28 U.S.C. § 1331, that arises under a federal statute, the FHA.  This Court has supplemental jurisdiction over the Government Code claims and other California state claims brought herein pursuant to 28 U.S.C. §1367.

## V.     VENUE

33.      Venue is proper in the United States District Court, Eastern District of California, pursuant to the FHA, because Defendants conduct business in this district, because the City is located in this district, and a substantial part of the events and omissions giving rise to the City's claims occurred in this district.

## VI.    WELLS FARGO ENGAGED IN DISCRIMINATORY LENDING PRACTICES

34.    Wells Fargo engaged in both intentional discriminatory business practices and neutral business practices that created "artificial, arbitrary and unnecessary" barriers to fair housing opportunities for minority home purchasers and owners. Confidential Witnesses ("CWs") confirm the existence of these practices.  The CWs are former Wells Fargo employees responsible for making and/or underwriting loans on behalf of Wells Fargo in Sacramento, and each had clients in Sacramento.  CW1 worked for Wells Fargo from 2012 to 2017 as a home mortgage consultant in the Roseville Office.  CW2 worked for Wells Fargo from 2016 to 2017 as a Home Mortgage Consultant in the Folsom Office.   CW3 worked for Wells Fargo from 2011 to March 2016 as a Home Mortgage Consultant in the Roseville Office. CW4 worked for Wells Fargo as a home mortgage consultant in the Sacramento area from 1999 to February 2016. During her last few years at Wells Fargo, she was based at the Elk Grove home mortgage branch.

### A.    Wells Fargo Intentionally Discriminated Against Minorities in Violation of the Fair Housing Act and the FEHA

35.    The CWs confirm a wide pattern and practice at Wells Fargo in which employees intentionally steered minority borrowers into higher cost loans because of their race or ethnicity.

36.    Wells Fargo's loan officers and mortgage consultants used race as a factor in determining which loan products to offer borrowers, what interest rates to charge, and whether to use certain devices and options such as "lender credits."

37.    CW1 explained that his sales manager told loan officers to give different sales pitches to prospective borrowers depending upon the neighborhood where the home was located.

38.    In particular, this manager instructed loan officers to offer lender credits to borrowers in minority neighborhoods in order to close as many loans as possible.  Lender credits increased the cost of a loan in exchange for the Bank paying closing costs.   The manager informed loan officers that "this is how you make it work .  .  . if you give them this little bit higher interest rate, you can give them a lender credit, and that would make the loan go through." Significantly, CW1 explained that loans issued with lender credits are more expensive than loans originated without these credits.  CW1 further stated that the Bank did not require loan officers to explain that after a certain number of years a borrower was no longer paying a higher interest rate in exchange for the closing costs (the "breakeven point").  After the breakeven period, a

borrower was simply stuck for the duration of the loan with a more expensive loan without any corresponding benefit to the borrower.

39.     According to CW1, Wells Fargo aggressively priced small loans that were often were offered and made to minority borrowers. These loans were up to a half-percent more expensive than other loans that were other to non-minority and white borrowers.

40.     CW2 stated that his branch manager would make comments regarding a potential borrower's appearance, including race, when telling a loan officer not to waste time with the borrower because they could not qualify for a loan.  CW2 also heard other loan officers make comments regarding a potential borrower's ethnicity and/or race that was consistent with racial profiling and the borrower's ability to re-pay the loan.  For example, if a borrower had a Mexican name, loan officers were likely to exercise their discretion to charge a higher rate and issue a more expensive loan to make up for a discount given to non-minority borrowers.

41.     CW2 said that minority borrowers did not always appear to understand the terms and the consequences of Bank's mortgage loans, but that Bank employees did not bother to further explain them.

42.     CW4, who is Spanish speaking, stated that there was a constant shortage at Wells Fargo in Spanish-speaking loan officers in the Sacramento area. As a result, Spanish-speaking borrowers often had non-Spanish speaking loan officers to deal with in Sacramento.

43.     CW4 also stated that Wells Fargo supplied marketing materials for mortgages in Spanish, but the Bank did not produce mortgage disclosures in Spanish for minorities to sign even when they did not read and write in English and the transaction was handled in Spanish.

44.     CW4 stated that the lack of quality Spanish translations or Spanish speaking loan officers during the mortgage process resulted in minority borrowers signing loans they did not fully understand and/or were more expensive than necessary.  In particular, the Bank charged higher interest rates for small mortgages that were often sold to minority borrowers, which resulted in those borrowers paying a higher cost to purchase a home loan than white borrowers.

45.     CW4 repeatedly complained to her managers about the fact that Spanish speaking borrowers are not provided with either verbal or written explanations in the language they understood and that as a result they did not understand the terms and cost of the loan they purchased.  She stated "I complained many times," she said. "I'd tell them, 'We cannot do this. This is not legal.'"  However, her managers did nothing to change their policies and Spanish-

speaking borrowers continued to be served by non-Spanish-speaking loan officers "more often than not."

46.     CW4 believes the managers did not want to address this issue because it would have required the non-Spanish-speaking loan officer to give the mortgage to another loan officer who did speak Spanish, and in that process the non-speaking Spanish loan officer would lose their full commission on the loan.  In other words, Wells Fargo deliberately created an incentive program that induced minority borrowers to take higher cost loans under terms that they did not understand nor were explained to them.

**B.     Wells Fargo's facially neutral business practices and policies created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners**

47.     Wells Fargo engaged in numerous facially neutral lending practices that resulted in the disparate impact reflected in the statistical analyses set forth in this complaint during the time periods at issue herein.  These practices are united because they represent manifestations of the same continuous and unbroken practice of engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners.  A partial list of these practices includes, but is not limited to, the following:

  a.     providing loan officers discretion to place borrowers in more expensive and riskier loans than the borrowers qualified for, while creating a pressure cooker environment to impel the officers to use that discretion in the discriminatory manner in which it was used;

  b.     authorizing loan officers to sell lender credits to borrowers without disclosing the true effect of the pricing of those credits;

  c.     marketing certain more expensive or riskier loan products to residents in predominantly minority neighborhoods;

  d.     utilizing a compensation scheme that incentivized loan officers to sell more expensive and riskier loans than borrowers qualified for;

  e.     requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their discriminatory loan to a prime loan;

   f. charging excessive points and fees that are not associated with any increased benefits for the borrower; and

   g. providing loan officers with information about loan pricing that is higher than the lowest price Wells Fargo could offer the borrower.

48. According to Mary Kay Woodward, a Wells Fargo Senior Vice-President and Lending Manager, Defendants' policies relating to risk management, credit, and loan underwriting are centralized policies formulated by Wells Fargo to be deployed nationwide, and these policies are not unique to any specific location.  Upon information and belief, these centralized policies extend to formulating and structuring loans, and led to discriminatory lending practices in violation of the FHA and the FEHA.

49. According to CW3, when she began working at Wells the compensation for a branch manager was based upon profitability of the branch.  Eventually, this compensation plan was eliminated for branch managers, but area managers continued to receive bonuses based upon profitability of branches.

50. According to CW3, loan officers were rated in part on pricing averages, and if they offered a discount to generate business, they would often respond by laughing and stating that "we'll just make it up on the next FHA client."  These loan officers would then compensate for a loss in their pricing average by charging borrowers who were unfamiliar with mortgage loans and/or did not scrutinize loan pricing, which impacted minorities, particularly those with little to no English-speaking skills.

51. CW3 also stated that if closing costs exceeded the amount allowed by federal law, loan officers gave borrowers loans with lender credits without always informing the borrower. Thus, the borrower was not making an informed choice but was told that's the rate being offered by the Bank.

52. The CWs statements make clear that these discriminatory lending practices contributed to the adverse borrowing terms experienced by minority borrowers.  The City hereby incorporates by reference all allegations contained in the preceding paragraphs pertaining to statements made by CWs.

53. The CWs statements provided numerous ways that loan officers were afforded discretion to place a borrower in a more expensive loan than the borrower qualified for, the ways

that sales pressures directed the loan officers to utilize that discretion in this manner, and the ways that the impelled use of that discretion resulted in discriminatory effects.

54.     Similarly, loan officers used their discretion to sell more expensive FHA loans to minority borrowers who otherwise qualified for conventional loans.

55.     Upon information and belief, Wells Fargo entered a borrower's financial information into the Bank's loan pricing software system.  The program calculated a price for the loan, but also provided a range of prices for which the loan officer had discretion to charge the borrower and reap higher financial rewards.  This process resulted in the issuance of more expensive loans to minority borrowers.

56.     Upon information and belief, Wells Fargo targeted minority borrowers for loans with lender credits and minority borrowers were more receptive to these types of loans than white borrowers.  With a lender credit loan, the bank pays a borrower's closing costs in exchange for receiving a loan with a higher interest rate.  Over time, the borrower repays the credits by making higher monthly payments. At a certain point in time referred to as the "pay back" period, the borrower is no longer repaying the credits but instead is making payments on a higher interest rate loan that generates additional revenue for Wells Fargo with no additional benefits for the borrower.   For example, FHA loans often required closing costs that exceeded the relatively low down payment required for this type of loan.  Borrowers unable to pay the closing costs therefore needed to obtain lender credits, and it would require a significant increase in the interest rate to receive enough lender credits to cover $4,000 to $5,000 in closing costs.

57.     Together, Wells Fargo's practices have symbiotic effects. Loan officers are afforded discretion to sell higher-priced loan products. Loan officers are pressured to sell those more expensive products and financially incentivized to do so. Loan officers frequently use race and educational background as proxies for their ability to sell more expensive loan products. These more expensive loan products often have closing costs, which exceed the down payment, leading to the sale of lender credits to the borrowers.  And as a result, borrowers residing in minority neighborhoods with lower home values and with less ability to pay closing costs received more loans with higher interest rates than white borrowers who did not require lender

credits to pay closing costs.  The high cost effect of the lender credits throughout the life of the loan was not explained or disclosed.

58.    Furthermore, Wells Fargo uses financial incentives to encourage loan officers to use their discretion to sell more expensive and riskier loans. Indeed, loan officers were financially incentivized to sell more expensive loans.  Upon information and belief, loan officers were provided with financial incentives by Wells Fargo if they issued loans to borrowers at higher rates than the borrowers were actually qualified to receive.  Not coincidentally, upon information and belief, loan officers received higher commissions from the sale of more expensive loans to minority borrowers, and the effect of these financial incentives was to encourage the issuance of discriminatory loans to minority borrowers.

59.    Upon information and belief, the practices and problems described by these confidential witnesses are consistent with those perpetrated by Wells Fargo throughout the country and have continued into the present.

60.    In addition to these policies and practices, Wells Fargo's omissions and failures to act and institute adequate policies to combat against the discriminatory effects of its conduct make Wells Fargo further culpable for the discriminatory effects of its conduct.  These omissions and failures to act include, without limitation:

    a.    knowing about lending practices that either created high risk and higher cost loans to minorities compared to comparably credit situated white borrowers or failing to adequately monitor the Bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

    b.    failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history;

    c.    failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s;[14]

_____

[14] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable. Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

d.      failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity;

e.      failing to monitor and implement necessary procedures within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes Wells Fargo's retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws;

f.      failing to abide by the terms of Wells Fargo's Vision & Values, which purportedly guides Defendants' business practices and relationships with customers and constitutes a contractual promise to customers; and

g.      failing to ensure that Wells Fargo's decentralized organizational structure was capable of properly monitoring mortgage lending activities within Community Banking.

61.     As discussed herein, the actual and foreseeable effect of these neutral business practices and omissions and failures to act has created a statistically significant adverse effect on minority borrowers.

62.     Wells Fargo's discriminatory lending practices stem from pervasive and long-running problems, including the company's corporate culture, which emphasized sales and revenues first and foremost, compensation structure, and failure of internal controls and other pertinent compliance procedures.  Wells Fargo itself has acknowledged these problems.

63.     For example, when consenting to the Federal Reserve's $85 million penalty in 2011, Wells Fargo acknowledged that its flawed culture, employment practices, and internal controls contributed to widespread illegal lending practices.  Specifically, Wells Fargo acknowledged that its employees "were expected to sell (a) a minimum dollar amount of loans to avoid performance improvement plans that could result in loss of their positions . . . and (b) a minimum dollar amount of loans to receive incentive compensation payments" and that many employees, "in order to meet sales performance standards and receive incentive compensation, altered or falsified income documents and inflated prospective borrowers' incomes to qualify

those borrowers for loans that they would not otherwise have been qualified to receive."  As Wells Fargo admitted, this misconduct occurred because Wells Fargo's "internal controls were not adequate."

64.     The very next year, in 2012, Wells Fargo agreed to pay $175 million to resolve claims by the United States Department of Justice that between 2004 and 2009, Wells Fargo Bank, N.A. engaged in a pattern or practice of discrimination on the basis of race and national origin in residential mortgage lending in violation of the Equal Credit Opportunity Act and the Fair Housing Act.

65.     Subsequently, in 2016, Wells Fargo agreed to pay $1.2 billion to settle additional civil mortgage fraud claims brought by the Department of Justice.  In the settlement, Wells Fargo admitted, acknowledged and accepted responsibility for, among other things, certifying to the Department of Housing and Urban Development, during the period from May 2001 through December 2008, that certain residential home mortgage loans were eligible for government insurance when in fact they were not, resulting in the Government having to pay insurance claims when some of those loans defaulted.  The $1.2 billion settlement with Wells Fargo was the largest recovery for loan origination violations in the Federal Housing Authority's history.

66.     Wells Fargo's Community Banking operating segment, which includes the retail mortgage banking business responsible for the unlawful lending activities at issue herein, is by far the most profitable of Defendants' three operating business segments.  For example, in 2015, Community Banking reported net income of $13.5 billion, representing 59% percent of Defendants' total 2015 net income,[15] and in 2016 Community Banking reported net income of $12.44 billion, representing 57% of Defendants' total 2016 net income.[16]  Prior years yielded similar results.[17]  Defendants' unlawful mortgage lending conduct at issue herein was an

_____

[15] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2015-annual-report.pdf at 30, 48.
[16] https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2016-annual-report.pdf at 40, 51.
[17] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2014-annual-report.pdf at 34, 46; https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2013-annual-report.pdf at 34, 44; https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2012-

important component of Community Banking's financial success and Wells Fargo's bottom line profitability.

67.   At all times pertinent to this action, Wells Fargo was guided by its widely criticized philosophy of cross-selling eight products to each customer, commonly referred to as the "Gr-Eight."  Within Community Banking, "the cross-sell metric represents the relationship of all retail products used by customers in retail banking households."[18]  Mortgage loans represent one of these retail products at issue in the cross-selling scandal.  This practice has resulted in the commencement of actions by numerous government entities, including hearings before committees of both the United States Senate and House of Representatives in the fall of 2016, as well as Shareholder's Derivate and Federal Securities lawsuits.

68.   Systematic problems with Wells Fargo's culture, employment practices, and internal controls persist to this day as reflected by the Federal Reserve Board's Enforcement Action and the related letters sent by Michael Gibson, Director of Supervision and Regulation, to former CEO Stumpf, former Lead Independent Director Stephen Sanger, and the Board of Directors.[19]

69.   Wells Fargo's independent directors acknowledged in their Sales Practices Investigation Report dated April 10, 2017 ("Board Report")[20] after reviewing the root causes of pervasive fraud by Wells Fargo's Community Banking segment, employees frequently engaged in wrongdoing "to achieve sales goals and incentive compensation targets."  According to the directors, many Wells Fargo employees have stated "that incentive compensation plans overly emphasized sales performance, and many complained to Community Banking leadership that incentive plan goals were too high, too focused on sales and led to bad behavior."  The directors

annual-report.pdf at 34, 44; https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2011-annual-report.pdf at 30, 40.

[18] See, e.g., Wells Fargo & Co. Annual Report 2015, supra note 7, at 46.

[19] https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a2.pdf;
https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a3.pdf;
https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a4.pdf

[20] https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf.     Professor Howell Jackson of Harvard Law School provided an informative critique of the Board Report at https://corpgov.law.harvard.edu/2017/04/22/one-take-on-the-report-of-the-independent-directors-of-wells-fargo-vote-the-bums-out/

acknowledged: "The root cause of sales practice failures was the distortion of Community Banking's sales culture and performance management system, which, when combined with aggressive sales management, created pressure on employees to sell unwanted or unneeded products to customers and, in some cases, to open unauthorized accounts. Wells Fargo's decentralized corporate structure gave too much autonomy to Community Banking's senior leadership, who were unwilling to change the sales model or even recognize it as the cause of the problem."

70.     In addition to the decentralized operational structure and fragmentation of control functions, the Board Report provided specific details concerning the multiplicity of failures that occurred within Community Banking, including, but not limited to, the following:

- the Audit Department had access to information regarding sales practices but did not view its role as encompassing more broadly the root cause of the improper sales conduct;

- even as late as 2015 when sales practices were labeled high risk, there was a general perception within the bank's control functions that the sales practice problems were of relatively modest significance;

- the Board failed to receive information concerning the magnitude of the problems in a timely manner and the board's actions failed in several respects—(1) the bank should have centralized the risk functions at an earlier date; (2) the Risk Committee and Board should have insisted on a more detailed and concrete action plan to track sales practice abuses, which was not implemented until this year; and (3) the Board should have been more forceful in pushing its Chief Executive Officer, John Stumpf, to change leadership within Community Banking;

- control functions outside of Community Banking, including the Board, could not adequately assess the sales practice issues because Carrie Tolstedt (who has since been fired) reinforced a culture of tight control over information concerning Community Banking;

- Claudia Russ Anderson led the first line of defense for risk at Community Banking and her performance fell far short of what was expected/required from a senior risk officer.  She failed to adequately assess and advocate for changes in the business practices that resulted in the sales integrity violations; she ran interference for Tolstedt and filtered communications with other Wells control officers; she was too slow to address sales practice issues;

- there was a growing conflict over time between Wells Fargo's Vision and Values and Community Banking's emphasis on sales goals;

- even when challenged by their regional leaders, the senior leadership of Community Banking failed to appreciate or accept that their sales goals were too high and becoming increasingly untenable;

- the Community Banking identified itself as a sales organization, like a department or retail store, rather than a service-oriented financial institution;

- in February 2017, the Board announced the termination for cause of four officers within Community Banking, including the Group Risk Officer and the Head of Strategic Planning and Finance, who bore primary responsibility for overseeing the sales goals and incentive system;

- while sales practices at Community Banking became more apparent between 2013-2015, Corporate Risk was still a work in progress and the Chief Risk Officer had limited authority with respect to Community Banking;

- the legal department, particularly at the senior levels, failed to discuss or appreciate the seriousness and scale of the sales practice issues within Community Banking or fully consider whether there might be a pattern of illegal conduct involved; and

- sales practice concerns have been raised with regard to Community Banking's online insurance referral program.

71. On April 19, 2017, the Office of the Comptroller of the Currency issued a report titled "Lessons learned review of supervision of sales practices at Wells Fargo."[21]  The OCC Report noted numerous compliance related problems at Wells Fargo, including among others, the following:

- issues concerning sales practices were identified in the bank's audit committee reports as early as 2005;

- since 2005 the Board received regular Audit & Security reports indicating the highest level of EthicsLine internal complaint cases and employee terminations were related to sales integrity violations; and

---

[21]  https://www.occ.gov/publications/publications-by-type/other-publications-reports/pub-wells-fargo-supervision-lessons-learned-41917.pdf.

- in 2006 Wells Fargo's #2 strategic objective was "Going for Gr-Eight," which promoted doubling the number of products per customer to eight.

72.     Significantly, the systemic problems within Wells Fargo that enabled the unlawful sales practices to flourish regarding the unlawful opening of bank accounts and credit cards also enabled Wells Fargo to engage in the long-standing pattern and practice of unlawful mortgage lending at issue herein.   That point was made in a recent speech given by William Dudley, President of the Federal Reserve Bank of New York, referencing both the Wells Fargo new account scandal and sales practices in the mortgage banking industry.   According to President Dudley,

> Wells Fargo's chairman and CEO resigned after regulators uncovered what appeared to be widespread fraud in the retail bank.  Compensation, once again, seems to be at the center of a scandal.  Neighborhood bankers were paid based on the volume of new accounts opened, apparently with utter disregard for whether customers wanted them or even knew about them.  And, like mortgage brokers in the early 2000s, it appears that job security depended almost exclusively on meeting targets, regardless of how those targets were met.  There was a serious mismatch between the values Wells Fargo espoused and the incentives that Wells Fargo employed.[22]

73.     Thus, the compensation structure incentivized Wells Fargo employees in Community Banking and in other retail operations to evade internal controls and produce discriminatory, high cost loans to minorities, because such lending increased employee compensation and Wells Fargo's revenues.   Regardless of the type of product sold within the Community Bank, employees were incentivized to violate the law.

74.     Further evidence of multiple control failures within Wells Fargo directly impacting the mortgage business is reflected by the fact that for an extended period of time dating back to at least 2004, Wells Fargo has engaged in a continuous pattern and practice of issuing unlawful mortgages to minority borrowers throughout the country, and this practice is not limited within a small and isolated geographic region.   Both the scope and breadth of Defendants' unlawful lending conduct is consistent with extensive control failures.

---

[22] *See* https://www.newyorkfed.org/newsevents/speeches/2017/dud170321#footnote8.

75.     The Bank's Annual Reports include a lengthy discussion concerning risk management and the "Three Lines of Defense" protocol which comprises the risk framework wherein Internal Audit represents the "Third Line of Defense."[23]  According to a 2013 Position Paper written by the Institute of Internal Auditors, when Internal Audit functions as the third line of defense, it is supposed to provide the Board of Directors and senior management "with comprehensive assurance based on the highest level of independence and objectivity within the organization. . . .  Internal audit provides assurance on the effectiveness of governance, risk management, and internal controls, including the manner in which the first and second lines of defense achieve risk management and control objectives.  The scope of this assurance, which is reported to senior management and to the governing body [i.e. Board], usually covers:

- A broad range of objectives, including efficiency and effectiveness of operations, safeguarding of assets, reliability and integrity of reporting processes, and compliance with laws, regulations, policies, procedures, and contracts.
- All elements of the risk management and internal control framework, which includes: internal control environment; all elements of an organization's risk management framework (i.e., risk identification, risk assessment, and response); information and communication; and monitoring.
- The overall entity, divisions, subsidiaries, operating units, and functions - including business processes, such as sales, production, marketing, safety, customer functions, and operations – as well as supporting functions (e.g., revenue and expenditure accounting, human resources, purchasing, payroll, budgeting, infrastructure and asset management, inventory, and information technology."[24]

76.     As reflected in the Enforcement Action and the April 2017 Board Report, Wells Fargo's Internal Audit Department was plagued by a multiplicity of failures[25] and fell woefully short of the framework articulated in the IIA Position Paper as well as the assurances set forth in the Bank's Annual Reports.

---

[23] See *supra* note 3.
[24] IIA Position Paper: The Three Lines of Defense in Effective Risk Management and Control, Institute of Internal Auditors (January 2013) at pg. 5.  https://na.theiia.org/standards-guidance/Public%20Documents/PP%20The%20Three%20Lines%20of%20Defense%20in%20Effective%20Risk%20Management%20and%20Control.pdf.
[25] A partial list of these failures is set forth at pgs 91-96 of the Board Report.

77.    There is no legitimate business purpose for the foregoing policies and practices as non-discriminatory policies and practices could achieve any legitimate benefits inuring therefrom.

78.    Upon information and belief, the practices and problems described herein, including those described by the confidential witnesses, are consistent with those perpetrated by Wells Fargo throughout the country and have continued into the present.

**C.    Minorities in Sacramento Receive Discriminatory Loan Terms from Wells Fargo Regardless of Creditworthiness**

79.    As discussed herein, a non-exhaustive list of the types of loans that Wells Fargo steered minorities into when they otherwise qualified for less expensive and less risky loans include the following:  high-cost loans (*i.e.*, loans with an interest rate that was at least 3% above the Treasury rate prior to 2010 and 1.5% above the prime mortgage rate thereafter),[26] subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, higher cost government loans, including FHA[27] and VA[28] loans and HELOC's, and/or ARM loans with teaser rates (i.e., lifetime maximum rate > initial rate + 6%).

80.    Data reported by the Bank and available through both public and private databases shows that minorities in Sacramento received more expensive loan terms from Wells Fargo more frequently than white borrowers regardless of creditworthiness.

81.    A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2016, a discriminatory loan is 1.424 times more likely to result in foreclosure than a non-discriminatory loan.  An African-American borrower in Sacramento was 2.043 times more likely to receive a loan with discriminatory terms as a white borrower in

---

[26] This definition applies to first lien loans.

[27] FHA loans are insured by the Federal Housing Administration and require borrowers to pay for mortgage insurance and may entail other costs. People with credit scores under 500 generally are ineligible for FHA loans.

[28] VA loans are guaranteed by the U.S. Department of Veterans Affairs, available to veterans or surviving spouses who do not remarry, and generally do not require a down payment on the property.

Sacramento possessing similar underwriting and borrower characteristics.[29] The regression analysis further demonstrates that a Latino borrower in Sacramento was 1.444 times more likely to receive a discriminatory loan as a white borrower possessing similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.[30]

82.    The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660. An African-American borrower in Sacramento with a FICO score above 660 was 2.820 times more likely to receive a discriminatory loan as a white borrower in Sacramento with similar underwriting and borrower characteristics. A Latino borrower in Sacramento with a FICO score above 660 was 1.767 times more likely to receive a discriminatory loan as a white borrower in Sacramento with similar underwriting and borrower characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Hispanic and white borrowers.  A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Sacramento were more likely to receive more expensive and higher risk loans than borrowers in heavily white neighborhoods. For example, a borrower in a minority census tract (census tract consisting of at least 50% African-American or Latino households) was 1.758 times more likely to receive a discriminatory loan as a borrower with similar characteristics in a non-minority neighborhood in Sacramento (census tract with at least 50% white households). These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

83.    Additionally, data reported by the Bank and available through public databases shows that in 2004-2016, 7.2% of loans made by Wells Fargo to African-American and Latino

---

[29] As alleged throughout the complaint, all references to the date range 2004-2016 are intended to include the time period up to and including December 31, 2016. Wells Fargo issued more expensive and riskier loans to minority borrowers in Sacramento during this time period.

[30] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 1%.

customers in Sacramento were high cost, but only 3.8% of loans made to white customers in Sacramento were high cost. This data demonstrates a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers.

84.     Thus, the disparities regarding the issuance of more expensive and higher risk loans to minority borrowers are not the result of or otherwise explained by legitimate non-racial underwriting criteria.   As discussed below, Wells Fargo's neutral policies enabled and incentivized loan officers to make loan pricing decisions based on the borrower's race. The results were that loan officers used race as a factor in intentionally steering borrowers into more expensive and riskier loan products.  The referenced CW statements establish that Wells Fargo marketed high cost loans (including, but not limited to, FHA loans and loans with lender credits) in minority neighborhoods, failed to provide minority borrowers with all pertinent loan information, and did so due to Wells Fargo's belief that minority borrowers would be less likely to recognize the unfair terms of the offered loans due to a perceived lack of sophistication.  In so doing, Wells Fargo treated minority borrowers differently than white borrowers while seeking to maximize profits.

85.     The fact that loans issued pursuant to Wells Fargo's discriminatory lending practices are more heavily concentrated in minority neighborhoods in Sacramento has, based upon information and belief, contributed directly to the disproportionately high rates of foreclosure in the City's minority communities.

### D.     Sacramento's Data Analysis is Corroborated by Additional Studies and Reports

86.     The Sacramento rate-spread reportable or "high cost" analysis is similar to national trends as confirmed by an analysis of the national HMDA data for the period 2012-2014. According to a report prepared by the Center for Responsible Lending, "[t]he percentage of African-Americans with high cost loans rose from 5.3% in 2012 to 14.2% in 2013 to 25.5% in 2014.  Similarly, the rate rose from 5.9% in 2012 to 16.8% in 2013 to 28.3% in 2014 for Latino borrowers."[31]

_____

[31] Center for Responsible Lending Issue Brief, *Mortgage Lending Continues Under Dodd-Frank*, at 5 (Sept. 22, 2015), *available at* http://www.responsiblelending.org/mortgage-lending/policy-legislation/2014hmda_data_issuebrief_f.pdf.

87.     According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

88.     Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE L. REV. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

89.     Similarly, the Center for Responsible Lending's November 2011 Report, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes." Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows: whites – 6.2%; African-American – 21.4%; and Hispanic – 19.3%.[32]

90.     African-Americans and Latinos were much more likely to receive high-cost or high-risk loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.   These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[33] Disparities in the incidence of these features are evident across all segments of the credit spectrum.

---

[32] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures*, at 5, 21 (Nov. 2011), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground-2011.pdf.

[33] Center for Responsible Lending, *Lost Ground, 2011*, *supra* note 32.

E.     **Wells Fargo's Discriminatory Lending Practices Directly Cause Foreclosures.**

i.     **Data show that Wells Fargo's foreclosures are disproportionately located in minority neighborhoods in Sacramento.**

91.     Wells Fargo's failure to underwrite mortgage loans in minority and underserved communities in a responsible manner has been the subject of public attention and concern for years.  For example, its practices are the focus of a 2004 report from the Center for Responsible Lending.  The report concluded that Wells Fargo's customers "too often face the loss of their home or financial ruin as a result" of its "discriminatory practices."[34]  The discriminatory practices identified in the report include charging excessively high interest rates that are not justified by borrowers' creditworthiness; requiring large prepayment penalties while deliberately misleading borrowers about the penalties; convincing borrowers to refinance mortgages into new loans that only benefit Wells Fargo; deceiving borrowers into believing that they are getting fixed-rate loans when they are really getting adjustable rate loans; charging excessive fees; and more.

92.     Such reports underscore the direct connection between foreclosures affecting minority communities and Wells Fargo's discriminatory lending practices, and their attendant harm.

93.     In addition to the disproportionate distribution of Wells Fargo foreclosures in African-American and Hispanic neighborhoods, disparate rates of foreclosure based on race further demonstrate Wells Fargo's failure to follow responsible underwriting practices in minority neighborhoods. While 17.4% of Wells Fargo's loans in neighborhoods consisting of greater than 50% African-American or Hispanic neighborhoods in Sacramento result in foreclosure, the same is true for only 7.2% of its loans in non-minority (at least 50% white) neighborhoods in Sacramento.   In other words, a Wells Fargo loan in an African-American or Hispanic neighborhood is 2.728 times more likely to result in foreclosure as a Wells Fargo loan in a non-minority neighborhood. These odds ratios demonstrate a pattern of statistically significant

---

[34] Center for Responsible Lending, *A Review of Wells Fargo's Subprime Lending*, at 10 (Apr. 2004), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/ip004-Wells_Fargo-0404.pdf.

differences between African-American and white borrowers and between Hispanic and white borrowers.

94.     Furthermore, as discussed herein, foreclosures affect the value of both foreclosed properties and the properties in close proximity to the foreclosed properties.  Where, as is the case in the City of Sacramento, foreclosures are spatially concentrated to particular communities, the effects are magnified.  Indeed, when a property is foreclosed in proximity to another borrower such that the borrower's property value is reduced by the nearby foreclosure, that borrower's ability to obtain a refinancing of his/her loan is impaired.  This is because the equity ratio (*i.e.*, the ratio of the property's value to the loan principal) is decreased by the reduced property value. Because refinancing availability and terms are directly affected by the value of the securing property, such impairment can likewise contribute to the foreclosure of that borrower's property creating a downward spiral that magnifies the effects of the discrimination.

95.     Thus, Wells Fargo's discriminatory lending practices have directly caused and continue to cause foreclosures in Sacramento.

### ii.     Data show that Wells Fargo's loans to minorities result in especially quick foreclosures in Sacramento

96.     A comparison of the time from origination to foreclosure of Wells Fargo's loans originated in Sacramento from 2004 to 2016 shows a disparity with respect to the speed with which loans to Hispanics and white borrowers move into foreclosure. The average time to foreclosure for Hispanic borrowers in Sacramento is 3.566 years, and for white borrowers in Sacramento is 3.866 years. These statistically significant disparities demonstrate that Wells Fargo aggressively moved Hispanic borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers and provides further evidence of the directness between the issuance of discriminatory mortgages and resulting foreclosures.

97.     This disparity in time to foreclosure is further evidence that Wells Fargo is engaged in discriminatory lending practices.  The disparity in time to foreclosure demonstrates that Wells Fargo is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If Wells Fargo were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Sacramento, there would not be a significant difference in time to foreclosure

when comparing racial groups.  Were Wells Fargo underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than borrowers in white communities.   The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit. The HUD/Treasury Report confirms that time to foreclosure is an important indicator of discriminatory practices: "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[35]

### iii. Data show that Wells Fargo's discriminatory lending practices directly cause foreclosures in Sacramento

98.     Wells Fargo's discriminatory lending practices directly cause foreclosures and vacancies in minority communities in Sacramento.

99.     Issuing more expensive and riskier loans to minority borrowers than the loans for which they qualify and are issued to similarly situated white borrowers directly causes increased foreclosure rates because (1) the borrowers are required to make higher loan payments; and (2) as foreclosures begin to occur in a neighborhood, refinancing out of high-cost and high-risk loans becomes increasingly difficult due to suppressed loan-to-value ratios.  The difference between what a borrower who receives a more expensive loan must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage. Under these circumstances, a borrower who could otherwise have continued to make payments on the mortgage and remain in possession instead has a loan resulting in foreclosure because Wells Fargo issued a more expensive loan in violation of the Fair Housing Act.  The Bank's discriminatory lending conduct therefore directly causes foreclosures and vacancies. Moreover, as foreclosures depress property values, borrowers in the neighborhood who are already

---

[35] U.S. Dep't of Housing & Urban Development and U.S. Dep't of the Treasury, *Curbing Predatory Home Mortgage Lending*, at 25 (2000) ("HUD/Treasury Report"), *available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf.

struggling under the weight of high-cost and high-risk loans are increasingly unable to refinance their high-cost and high-risk loans which impels the borrowers toward foreclosure.

100.    Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also directly cause foreclosures and vacancies.  Some homeowners live in properties that they own subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender, such as Wells Fargo, solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance their existing loan into a larger loan without properly underwriting them to assure that they can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford should interest rates rise.  In some instances, the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain given the borrower's present debt obligations and financial resources. In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan. This causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

101.    A regression analysis of loans issued by Wells Fargo in Sacramento from 2004 to 2016, controlling for objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income, demonstrates that a high-cost or high-risk loan is 1.424 times more likely to result in foreclosure than a loan that is not high-cost or high-risk.

102.    The regression analysis also demonstrates that a high-cost or high-risk loan made to an African-American borrower was 2.080 times more likely to result in foreclosure as compared with a non-high-cost, non-high-risk loan made to a white borrower with similar borrower and underwriting characteristics.  A high-cost or high-risk loan made to a Latino borrower was 1.561 times more likely as a non-high-cost, non-high risk loan made to a white borrower with similar risk characteristics to result in foreclosure.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

103.     Regression analysis is the appropriate analytical tool to determine whether certain types of loans are more likely to enter foreclosure and reveals a direct causal relationship between the issuance of discriminatory loans and resulting foreclosures. Regression analysis is a statistical method for determining the relationship that exists in a set of data between a variable to be explained—called the "dependent variable"—and one or more "explanatory variables." In a regression to determine whether certain types of loans were more likely to result in foreclosure, the explanatory variables include whether the loan had predatory terms, the borrower's credit score, the lien type (first or subordinate lien), the property type (single-family home, condo, co-op, multifamily home, manufactured home, etc.), the loan purpose (purchase, cash-out refinance, rate-term refinance, etc.), the loan-to-value ratio, the combined loan-to-value ratio, the ratio of monthly loan payments to monthly income, the occupancy type (owner-occupied, second home, investment property), the month of loan origination, whether the loan became part of an agency or non-agency securitization, whether the loan was a conventional or an FHA/VA loan, whether the loan had an adjustable rate, and the property's neighborhood characteristics such as the ratio of median income in the borrower's Census tract to the median income in the metropolitan area, the share of homes in the Census tract that are owner-occupied, and the median year in which homes in the Census tract were built. By controlling for these characteristics, the regression can show whether the fact that a loan had discriminatory terms made that loan more likely to result in foreclosure than a loan without discriminatory terms but with identical characteristics in all other respects controlled for in the regression.

104.     Borrowers may have suffered financial hardships between the time they originated a loan and the time the loan entered foreclosure. At this time, due to data limitations, Plaintiffs' foreclosure regression does not control for every possible aspect related to financial hardships, such as job losses, medical hardships, or divorce, that could plausibly affect the likelihood of a loan entering foreclosure. However, adding such omitted characteristics to the current regression analysis would only affect the foreclosure odds ratio for the type of loan product to the extent that the omitted characteristic is correlated with the type of loan product. If there is no correlation between the presence of discriminatory terms in the loan and variations in financial hardships suffered by the borrower after loan origination, then adding financial hardship variables to the regression should have no material effect on the odds ratio measured by the current foreclosure regression. ("Omitting variables that are not correlated with the variable of interest is, in general,

less of a concern, because the parameter that measures the effect of the variable of interest on the dependent variable is estimated without bias." Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 303, 315 (Federal Judicial Center, 3d ed. 2011).)   Further, the foreclosure regression already controls for many aspects of the borrower's financial condition, including credit score, loan-to-value ratio, and ratio of monthly housing payments to monthly income. The current results show that, for borrowers with the same financial characteristics controlled for in the regression, borrowers receiving loans with discriminatory terms are more likely to suffer foreclosure than borrowers receiving loans without discriminatory terms.  Because of the ability of the regression to control for *other* external factors that might cause a foreclosure, the correlation between the discriminatory terms and the foreclosure event indicates a causal relationship.

105.    Furthermore, Wells Fargo's Woodward testified that Wells Fargo maintains a comprehensive worldwide database with robust statistical data regarding foreclosures, defaults, and delinquencies and that credit policies regarding these outcomes are continually updated.  This is consistent with the ongoing measurement and monitoring of credit risk analysis set forth in the Bank's annual report.[36]

106.    A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also chaired the Federal Housing Finance Board. Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.   The Apgar-Duda report has continually been cited by subsequent

---

[36]  https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2016-annual-report.pdf at 67-68.

governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[37]

107.    This significant report highlights the direct connection between Wells Fargo's discriminatory lending practices in cities such as Sacramento and the resulting foreclosures, demonstrating that such foreclosures impose direct, significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

108.    Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites. The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.   For example:  approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates.[38]

109.    Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[39]

## VII.    INJURY TO SACRAMENTO CAUSED BY WELLS FARGO'S DISCRIMINATORY LOAN PRACTICES

110.    Sacramento's injuries are a direct consequence of Wells Fargo's unlawful conduct. Wells Fargo issued discriminatory loans to minority borrowers at rates higher than those issued to similarly situated white borrowers.  Those discriminatory high-cost loans led to

---

[37] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures: A Chicago Case Study* (2005), *available at* http://neighborworks.issuelab.org/resource/municipal_ cost_of_foreclosure_a_chicago_case_study.

[38] Center for Responsible Lending, *Lost Ground, 2011*, *supra* note 32.

[39] *Id.* at 6.

foreclosures that would not have occurred absent the discriminatorily high cost of the loans.  The initiation of the foreclosure process resulted in injury to the City.  For example, once the foreclosure process was initiated, the properties in question often became derelict and neglected, causing harm to the City which had to provide municipal services while the properties simultaneously decreased in value, resulting in lowered property tax revenue.

111.   Sacramento has suffered both non-economic and economic injuries as a direct result of Wells Fargo's longstanding, continuing policy and practice of intentionally steering minority borrowers in Sacramento into mortgage loans that have higher costs and risk features than more favorable and less expensive loans issued to similarly situated white borrowers, and engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners. Without the implementation of these policies, neither borrowers nor the City would have suffered the resultant injuries.   These practices have resulted in the disproportionately high rate of foreclosure on Wells Fargo loans to African-Americans and Latinos in minority and low-income neighborhoods in Sacramento.  Sacramento seeks redress for the resulting injuries to the City directly caused by Wells Fargo's policies and practices.  The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than Wells Fargo.[40]

112.   Wells Fargo continues to engage in the discriminatory pattern or practices described herein with similar and continuing deleterious consequences to the City.

113.   Through the use of expert evidence and analytic tools such as Hedonic regression, Sacramento is capable of establishing that the Bank's discriminatory lending practices were a direct cause of the resulting injuries alleged herein.

A.   **Non-Economic Injuries**

114.   Wells Fargo's conduct has directly and adversely impacted the ability of minority residents to own homes in the City, thereby impairing the City's goals to assure that racial factors

---

[40] For clarity, the City seeks redress in this action for injuries resulting from foreclosures on mortgages for which Wells Fargo is responsible, including residential home loans and lending operations acquired from, and/or sold by or through the Acquired Entities.

do not adversely affect the ability of any person to choose where to live in the City or to detract from the social and professional benefits of living in an integrated society.

115.    Promoting sustainable, stable, and integrated communities is a core objective for the City both within new and existing neighborhoods.   Sacramento recognizes that "Integration of neighborhoods and communities throughout the City contemplates a vibrant and diverse population.   Housing, along with other key components in the built environment, plays an important role in the extent of integration one finds in neighborhoods and throughout the larger community."  The City further seeks to encourage racial and economic integration, fair housing, and the elimination of discrimination. The City supports fair housing education programs offered by local organizations including the Board of Realtors, promotes an equitable distribution of housing types for all income groups and promote mixed income neighborhoods.  Additionally, to reduce predatory and subprime lending practices in Sacramento, the City requires partner banks and lending institutions to invest in the community in a responsible manner.[41]

116.    The Sacramento Housing and Redevelopment Agency ("SHRA"), a joint powers agency created by the Sacramento City Council and the Sacramento Board of Supervisors, serves as the Housing Authority, the Redevelopment Agency, and the Housing Finance Department for the City and County of Sacramento.[42]  The SHRA provides funding for development of rental and homeownership housing for low income individuals, and mortgage assistance for first time homeowners for a variety of affordable housing types throughout the City.  The SHRA also coordinates with a variety of nonprofit organizations providing housing and/or social services within the City, including Mercy Housing, Volunteers of America, Sacramento Neighborhood Housing Services, Lutheran Social Services, InfoLine Sacramento, Self-Help Housing, Turning Point Community Programs, Transitional Living and Community Support, Loaves and Fishes, Sacramento Veterans Resource Center, among others.   SHRA, through the City's Community Development Block Grant program, funds services for residents impacted by discriminatory housing practices by supporting the Sacramento Self Help Housing and Legal Services of Northern California organizations.[43]

---

[41] Housing Element, *supra* note 13.
[42] http://www.shra.org/
[43] http://www.sacselfhelp.org and http://lsnc.net.

117.    The SHRA is governed by the Sacramento Housing and Redevelopment Commission, whose members are appointed by the Sacramento City Council and the Sacramento Board of Supervisors.  The functions of the Commission include: "Determine where slum areas exist or where there is a shortage of decent, safe, and sanitary dwelling accommodations for persons of low-income."  (Sacramento City Code Section 2.80.040).[44]  The City, through its Community Development Department, works closely with the SHRA to plan for development of new affordable housing.

118.    The City Community Development Department is responsible for planning for numerous housing programs designed to ensure that housing needs are met for all residents of the City.[45]  The City's Housing Element represents a "civic philosophy for housing in Sacramento that is purposeful, inclusive, and reflective of the realities of living in Sacramento in the second decade of the 21st Century." The Housing Element focuses on six themes, which reflect key challenges for City housing policy and programs.  The Community Development Department also collects money for the Housing Trust Fund, which provides resources to increase the supply of affordable housing for low income individuals who currently, or are likely to become members of the City's workforce.  These funds further serve to create a nexus between jobs and housing in Sacramento.  The Code Compliance Division promote and maintain safe and desirable living and working environments and strives to improve the quality of the community and ensuring the proper upkeep of residential units throughout the City though partnerships with residents, neighborhood associations, public service agencies and various City departments.[46]

119.    The Bank's discriminatory lending practices directly interfere with the City's ability to achieve these important objectives.

**B.    Economic Injuries**

120.     The City has directly suffered economic injury based upon reduced property tax revenues resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties. In addition, the City has suffered

---

[44] http://www.qcode.us/codes/sacramento/
[45] http://www.cityofsacramento.org/Community-Development/Planning/Long-Range/Housing-Programs
[46] http://www.cityofsacramento.org/Community-Development;
http://www.cityofsacramento.org/Community-Development/Code-Compliance;

economic injury resulting from the cost of municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions, which exist at properties that were foreclosed as a result of Wells Fargo's illegal lending practices.  The City, through the Regional Human Rights /Fair Housing Commission ("HRFHC"), a joint powers agency created by the Sacramento City Council and the Sacramento Board of Supervisors, also provided housing counseling services, the need for, and cost of which has been increased significantly by these discriminatory lending practices.  Due to a lack of funding, as of October 2014, the HRFHC no longer provides services to investigate claims of housing discrimination.  Those complaints are now addressed by non-profit organizations funded by the City and County through referral by 211 Sacramento.[47]

121.   In addition, the City has suffered economic injury resulting from the cost of municipal services that it provided and still must provide to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Wells Fargo's illegal lending practices.

### i. Sacramento has been injured by a suppression of property tax revenues from foreclosures caused by Wells Fargo's discriminatory lending practices.

122.   When a home falls into foreclosure, it reduces the property value of the foreclosed home as well as the values of other homes in the neighborhood.  These reduced property values in turn suppress property tax revenues to the City.

123.   As property values decrease (or fail to rise as much as they would absent Wells Fargo's discriminatory lending practices), Sacramento loses substantial, material amounts of property tax revenues from the suppressed value of the foreclosed homes themselves and those in the surrounding neighborhood.

124.   The suppressed property values of foreclosed homes in turn directly reduce property tax revenues to the City and constitute damages suffered by Sacramento. Property tax revenue is initially received by Sacramento County and then distributed to the City of Sacramento.

---

[47] http://www.211Sacramento.org

125.    There is a direct relationship between each dollar of property tax received from the County based upon fluctuating property values and the ability of the City to fund essential services and programs for residents.

126.    Property tax losses suffered by Sacramento caused by vacancies resulting from Wells Fargo's foreclosures are fully capable of empirical quantification.  For example, attached hereto as Exhibit A is a chart listing the reduction in property values corresponding to a sample of addresses located in Sacramento where discriminatory loans issued by Wells Fargo entered the foreclosure process.   Each of these properties was secured by a loan that was originated after 2004.  The property values for each of the addresses set forth in Exhibit A decreased significantly after entering the foreclosure process and never returned to the pre-foreclosure value.

127.    Vacancies and short sales even prior to completion of foreclosure also result in diminished home values. Indeed, "[i]n 12 states, including California, Florida, Arizona, New York and New Jersey, pre-foreclosure sales actually outnumbered REO sales."[48] Such distressed sales reduce property values.[49]

128.    The property value of homes in foreclosure tends to be suppressed as compared with those homes not in foreclosure (*e.g.*, 28%).[50]  The suppression of property values can be measured by economic analysis applying various objective criteria, including the well-established Federal Housing Finance Agency Home Price Index for Sacramento.

129.    A portion of this lost home value is attributable to homes foreclosed as a result of Wells Fargo's discriminatory lending practices.

130.    Homes in foreclosure tend to experience a substantial decline in value, and the relative decline can be measured by a number of objective criteria, including the well-established Case-Shiller Home Price Index.   A portion of this lost home value is attributable to homes

---

[48]*See* http://www.realtytrac.com/content/news-and-opinion/short-sales-increasing-in-2012--short-sale-process----realtytrac-7204.

[49]   *See*   http://www.realtytrac.com/content/foreclosure-market-report/us-foreclosure-sales-and-short-sales-report-q1-2013-7732.

[50] Campbell, John Y., Stefano Giglio & Parag Pathak, National Bureau of Economic Research, NBER Working Paper Series, *Forced Sales and House Prices* (Apr. 2009), *available at* http://www.nber.org/papers/w14866.pdf?new_window=1.

foreclosed as a result of Wells Fargo's discriminatory loan practices. No intervening steps occur that otherwise explain the economic impact of discriminatory lending that produces foreclosure.

131.    Property tax losses suffered by Sacramento caused by vacancies resulting from Wells Fargo's foreclosures are fully capable of empirical quantification.

132.    Routinely maintained property tax and other data allow for calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures. Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to Wells Fargo foreclosures and vacancies caused by discriminatory lending from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well maintained, and more. Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

133.    The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.  This loss can be distinguished from any loss attributable to non-Wells Fargo foreclosures or other causes.  The loss in property value in minority and low-income neighborhoods in Sacramento attributable to Wells Fargo's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

134.    Foreclosures attributable to Wells Fargo's discriminatory lending practices in minority and low-income neighborhoods in Sacramento can be analyzed through Hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-Wells Fargo foreclosures or other causes.  The loss in property value in minority and low-income neighborhoods in Sacramento attributable to Wells Fargo's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

135.    Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[51]

136.    Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[52]

137.    These studies highlight the direct connection between reduced tax revenues to the City as the result of foreclosures and Wells Fargo's discriminatory lending practices.

138.    And most recently, a Los Angeles study reported, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%."  Thus, "[i]n Los Angeles impacted homeowners could experience property devaluation of $53 billion."[53]  This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

139.    Application of such Hedonic regression methodology to data regularly maintained by Sacramento can be used to quantify the property tax injury to the City directly caused by Wells Fargo's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

140.    Wells Fargo foreclosure properties and the problems associated with them likewise significantly reduce surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Sacramento.

---

[51] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 Housing Policy Debate 57, 69 (2006).

[52] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

[53] The Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball: What Foreclosures are Costing Los Angeles Neighborhoods*, at 3 (2011) ("Cost to Los Angeles Report").

ii. **Sacramento is injured because it provided and still must provide costly municipal services for foreclosure properties in minority neighborhoods as a direct result of Wells Fargo's discriminatory lending practices**

141. Wells Fargo's discriminatory mortgage practices directly cause damage to the City because the City is required to provide increased municipal services at these properties to remediate blighted conditions. Even prior to completion of the foreclosure process, data show that 20% of homes undergoing foreclosure are vacated.[54] These services would not have been necessary if the properties had not been the subject of Wells Fargo's discriminatory mortgage practices. Moreover, these foreclosures resulting from Wells Fargo's unlawful conduct have contributed to the necessity for the City to divert essential municipal services that would have been utilized for other purposes to promote the health, welfare, and safety of its residents.

142. Wells Fargo's discriminatory lending practices and the subsequent foreclosures have put a strain on the resources of the City's Police Department and negatively impacted the ability to police a wide assortment of communities within the City of Sacramento over the last several years.

143. For example, the City's Police and Fire Departments have sent, and will continue to send personnel and police/fire vehicles to Wells Fargo foreclosure properties to respond to a variety of problems. These problems include increased vagrancy, criminal activity, fire hazards, and threats to public health and safety that arise at these properties because of their foreclosure status. Because violent crime has generally been found to increase due to foreclosures, the Sacramento Police and Fire Departments must respond to calls reporting suspicious activity at foreclosure properties and perform ongoing investigations involving criminal activity, including gang activity, at these properties.

144. Foreclosed properties required the Police Department to dedicate resources to respond to issues which required it to deploy, in numbers and frequency otherwise unusual, uniformed officers and plain-clothed detectives, and to seek the assistance of Licenses and Inspections Officers and other resources from other Departments within the City of Sacramento.

---

[54] *See* RealtyTrac, *Owner-Vacated Properties Represent 20 Percent of All Foreclosures Nationwide* (June 2013), *available at* http://www.realtytrac.com/content/foreclosure-market-report/owner-vacated-foreclosure-update-7771.

This response was caused in part by the increased level of crime plaguing the neighborhoods as a result of foreclosed and/or abandoned homes.  The crimes generating these additional resource requirements include burglaries to the properties and the surrounding homes, armed robbery, public intoxication, drug sales and possession including heroin and cocaine, vehicle theft, break-in, or abandonment, vagrancy, home squatters, and prostitution and lewd conduct.

145.    Code enforcement complaints abound at foreclosed properties as well subsequent to the date when a property initially entered the foreclosure process.   These violations require an inspector to visit the site of a complaint – often multiple times – and follow up to ensure abatement.  The abatement itself may sometimes require work hours from multiple municipal agencies.

146.    All of these incidents had a negative impact on the property value of not just the foreclosed homes themselves, but on the remaining residences of the neighborhoods, all the while creating an increased fear of crime and victimization among residents.  Though many of these problem areas were identified by beat officers on regular patrol, many of the abandoned properties prompted numerous contacts to the Sacramento Police Department.  These complaints came in the form of emails, phone calls, and personal complaints that were directly received by the City.

147.    These complaints required officers to consistently check on these properties and required a disproportionate amount of resources to manage the problem.

148.    The City frequently hires independent contractors to perform certain services, including, but not limited to, (i) removing excess vegetation at vacant properties, (ii) hauling away trash and debris at vacant properties, (iii) boarding vacant property from casual entry, (iv) putting up fencing to secure vacant properties, and (v) painting and removing graffiti at vacant properties.

149.    The Sacramento City Attorney's Office has devoted, and will continue to devote personnel time and out-of-pocket resources to perform a number of tasks that arise at these properties because of their foreclosure status. These include, but are not limited to the following: prosecuting code enforcement cases; filing receivership actions; prosecuting drug and gun eviction cases against tenants that engage in illegal narcotics activities or firearm offenses; prosecuting criminal trespass actions against squatters and transients; and pursuing court ordered injunctions involving a myriad of potential problems at foreclosure properties. Numerous inspections revealing code enforcement violations at properties within the City of Sacramento

occurred during the limitations period.  At the time of these inspections, the properties were under Wells Fargo's control.  The City of Sacramento expended time and resources logging these events, and following up with Wells Fargo to get the violations cured.  The City often had to make multiple contacts and requests before the violations were cured.

150.    As confirmed by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services . . . . Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[55]

151.    Moreover, as discussed above, the Apgar-Duda report underscores the direct connection between municipal costs stemming from foreclosures in Sacramento and Wells Fargo's discriminatory lending practices.

## VIII.    SAMPLE PROPERTIES FROM THE CITY OF SACRAMENTO

### A.    Foreclosures

152.    Plaintiff, through expert analysis, has preliminarily estimated that between 2004 and 2016, at least four hundred and twenty (420) loans issued to minority owners for then-owner-occupied properties went into foreclosure.  Expert analysis has determined that this type of loan was more likely to be high-cost loans than those issued to borrowers who were not racial minorities.[56]

153.    High-cost loans issued disproportionately to minority borrowers violate the FHA and the FEHA as discriminatory because they were issued to minority borrowers and were more expensive than loans issued to similarly situated white borrowers.  Such discriminatory loans

---

[55] *Cost to Los Angeles Report*, *supra* note 53.

[56] The City anticipates that it will be able to identify more foreclosures resulting from the issuance of more expensive and high cost loans to minority borrowers who otherwise qualified for more favorable loans issued to white borrowers with the benefit of discovery.  The publicly available data utilized by Sacramento to generate the preliminary estimate is not as comprehensive as the data maintained by and in possession of the issuing bank itself, and certain private mortgage data vendors that service the banking industry refuse to sell their comprehensive data unless the purchaser agrees not to utilize it for the purpose of litigation.  This informational data asymmetry erects significant barriers to communities such as Sacramento which seek to promote fair housing and integrated communities on behalf of their residents.

issued by Wells Fargo are continuing to enter the foreclosure process.  The City has already incurred or will incur in the future, damages corresponding to each of these properties. A sample of property addresses corresponding to these foreclosures is set forth below:

- 141 McDaniel Circle, Sacramento, CA 95838
- 1820 60th Avenue, Sacramento, CA 95822
- 6780 Tortola Way, Sacramento, CA 95828
- 3600 40th Street, Sacramento, CA 95817
- 564 Morrison Avenue, Sacramento, CA 95838

154.   Upon information and belief, the Acquired Entities engaged in the same type of discriminatory conduct attributable to Wells Fargo at the time they issued loans to minority homebuyers.

**B.     Discriminatory Loans Issued Subsequent to February 23, 2016**

155.   Wells Fargo has continued to issue high-cost or high-risk loans to minority borrowers in Sacramento subsequent to February 23, 2016.  These loans violate the FHA and the FEHA and are discriminatory because they were issued to minority borrowers and were more expensive than the loans issued to similarly situated white borrowers during the limitations period.  Upon information and belief, as well as historic experience, a significant number of the properties corresponding to issuance of discriminatory loans subsequent to February 23, 2016 will result in foreclosures or other adverse events that will cost the City a loss of tax revenues and significant remediation costs.  A sample of property addresses corresponding to the issuance of these loans to minority borrowers all of which closed (*i.e.* "originated") during the limitations period is set forth below:

- 4084 Savannah Lane, Sacramento 95823 (originated 2/24/16)
- 1048 Westward Way, Sacramento 95833 (originated 7/7/2016)
- 11 Park West Ct, Sacramento 95831 (originated 11/7/2016)
- 7018 Remo Way, Sacramento 95822 (originated 11/29/2016)

156.   An examination of publicly available information on loans issued during the limitations period strongly supports the conclusion that a greater number of high-cost or high-risk loans were issued to minority borrowers than to non-minority borrowers during the two years preceding the filing of this Complaint.   Upon information and belief, the disparity

exemplified by the examination of the earlier loans persists.  In addition, the City maintains that there is a continuing violation of the same lending practices, and therefore that the statute of limitations is running and/or was tolled by Wells Fargo's conduct or agreement.  There is thus a single claim, requiring but a single evaluation of the overall disparate impact.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)

157.    The City repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

158.    The FHA's stated purpose is to provide, "within constitutional limitations, for fair housing throughout the United States."

159.    In contravention of that purpose, Wells Fargo's acts, policies, and practices as described constitute intentional lending discrimination on the basis of race. Wells Fargo has intentionally targeted residents of predominantly African-American and Hispanic neighborhoods in Sacramento for different treatment than residents of predominantly white neighborhoods in Sacramento with respect to mortgage lending. Wells Fargo has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans. Wells Fargo has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments. Wells Fargo has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

160.    Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Sacramento as compared to similarly situated whites and residents of predominantly white neighborhoods in Sacramento. This adverse and disproportionate impact is the direct result of Wells Fargo's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when

Wells Fargo had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps. These policies have caused African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Sacramento to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Sacramento, and that are materially more likely to result in foreclosure.

161.    These practices, which are united because they represent manifestations of the same continuous and unbroken practice of engaging in facially neutral business policies and practices that created an "artificial, arbitrary, and unnecessary" barrier to fair housing opportunities for minority home purchasers and owners, have caused African-American and Latino borrowers in low-income and predominantly African-American and Latino neighborhoods in Sacramento to receive mortgage loans from Wells Fargo that have materially less favorable terms than mortgage loans given by Wells Fargo to similarly situated white borrowers, and that are materially more likely to result in foreclosure.

162.    Wells Fargo's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)    Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)    Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

163.    Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

164.    Wells Fargo's policies and practices are continuing.

165.    The City is an "aggrieved person" as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of Wells Fargo's conduct.

166.    The City's damages include lost expenditures and use of resources to pursue fair housing, tax revenues from properties diminished in value or abandoned, and the need to provide increased municipal services in blighted neighborhoods resulting from foreclosures.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable and direct consequence of Wells Fargo's discriminatory lending practices. Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.

167.    Wells Fargo's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

168.    The City has substantial interest in preventing discriminatory lending that causes disproportionate minority home foreclosures within its boundaries, in preventing segregated areas where minority loans are more likely to foreclose, and in holding banks accountable for damages arising from that discriminatory lending. Accordingly, the City's interests in obtaining injunctive relief to prevent such discrimination and in remedying the blight and recovering the lost property taxes resulting from the disproportionately minority home foreclosures in Sacramento are directly related to ensuring "fair housing throughout the United States."

169.    In doing the acts herein alleged, Wells Fargo acted with oppression, fraud, malice, and in reckless or willful disregard of the City's rights, and Sacramento therefore is entitled to punitive damages in an amount according to proof at the time of trial.

### SECOND CLAIM FOR RELIEF
#### (Violation of the California Fair Employment and Housing Act
#### Gov't Code §§ 12900, *et seq.*)

170.    The City repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

171.    FEHA seeks to prohibit discrimination on the basis of race and national origin regarding the purchase of housing within California.

172.    In contravention of that purpose, Wells Fargo's acts, policies, and practices as described constitute lending discrimination on the basis of race. Wells Fargo has targeted residents of predominantly African-American and Hispanic neighborhoods in Sacramento and for different treatment than residents of predominantly white neighborhoods in Sacramento with respect to mortgage lending. Wells Fargo has targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans. Wells Fargo has targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments. Wells Fargo has targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

173.    Wells Fargo's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Sacramento as compared to similarly situated whites and residents of predominantly white neighborhoods in Sacramento. This adverse and disproportionate impact is the direct result of Wells Fargo's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that minority borrowers were placed in less expensive loan products for which they were qualified when Wells Fargo had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into more expensive and higher risk loans without regard for whether they qualify for less expensive loans; failing to properly underwrite loans to minority borrowers despite having extensive analytical tools and data to perform this task. This non-exhaustive list of policies has caused African-Americans and Hispanics and residents of predominantly African-American and Hispanic neighborhoods in Sacramento to receive mortgage loans from Wells Fargo that are more expensive and have higher risk features than mortgage loans given by Wells Fargo to similarly situated whites and residents of predominantly white neighborhoods in Sacramento and is more likely to result in damages to the City.

174.     Wells Fargo's residential lending-related acts, policies, and practices constitute reverse redlining and redlining and violate FEHA:

(a)      Discrimination on the basis of race and national origin in providing financial assistance for the purchase of housing, in violation of California Government Code § 12955(e); and

(b)      Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of California Government Code § 12955(i).

175.     Wells Fargo's policies or practices are not justified by business necessity or legitimate business interests.

176.     Wells Fargo's policies and practices are continuing.

177.     The City is an "aggrieved person" as defined by Gov't Code § 12989.1 and has suffered damages as a result of Well Fargo's conduct.

178.     The City's damages include lost tax revenues and the need to provide increased municipal services. The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending. Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.  Finally, the need to divert funding and resources from other City agencies, departments and funds to address these problems was a foreseeable consequence that was fairly traceable to Wells Fargo's discriminatory lending.

179.     Wells Fargo's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Hispanic borrowers.

180.     The City has substantial interest in preventing discriminatory lending that causes disproportionately minority home foreclosures within its boundaries, in preventing segregated areas where minority loans are more likely to foreclose, and in holding banks accountable for damages arising from that discriminatory lending. Accordingly, the City's interests in obtaining injunctive relief to prevent such discrimination and in remedying the blight and recovering the

lost property taxes resulting from the disproportionately minority home foreclosures in Sacramento are directly related to ensuring "fair housing throughout the United States."

181.   In doing the acts herein alleged, Wells Fargo acted with oppression, fraud, malice, and in reckless or willful disregard of the City's rights, and Sacramento therefore is entitled to punitive damages in an amount according to proof at the time of trial.

### THIRD CLAIM FOR RELIEF
### (Common Law Claim For Unjust Enrichment)

182.   The City repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

183.   Wells Fargo has received and utilized benefits derived from a variety of municipal services, including police protection, as well as zoning ordinances, tax laws, and other laws and services that have enabled Defendants to operate and profit within the City of Sacramento while engaging in a lengthy pattern and practice of unlawful activity.  Wells Fargo is not legally entitled to the benefits of these services to the extent they were utilized to further the unlawful conduct alleged herein.

184.   Defendants are aware of and have taken advantage of the services and laws provided by the City of Sacramento to further their unlawful businesses practices.

185.   As a direct and proximate result of Defendants' discriminatory lending practices, Defendants have been enriched at the City's expense by utilizing benefits conferred by the City and, rather than engaging in lawful lending practices, practicing unlawful lending practices that have both denied the City revenues it had properly expected through property and other tax payments and by costing the City additional monies for services it would not have had to provide in the neighborhoods affected by foreclosures due to discriminatory lending, absent the Defendants' unlawful activities. Additionally, by foreclosing on the properties for which Wells Fargo issued discriminatory loans, the City expended otherwise unnecessary externalities to protect the properties acquired by Defendants in foreclosure, including, at a minimum, increased police protection. Defendants were specially benefitted as the new owners of these properties. Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for its costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

186.     In addition, to its detriment the City has paid for the Defendants' externalities or Defendants' costs of harm directly caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

187.     Plaintiff hereby demands a trial by jury in this action on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.     Enter a declaratory judgment that the foregoing acts, policies, and practices of Wells Fargo violate the FHA 42 U.S.C. §§ 3604 and 3605 and California Government Code § 12900, *et seq.*;

B.     Enter a permanent injunction enjoining Wells Fargo and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing Wells Fargo and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1) and California Government Code § 12989.2;

C.     Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Sacramento for its injuries caused directly by the conduct of Wells Fargo alleged herein, pursuant to 42 U.S.C. § 3613(c)(1) and California Government Code § 12989.2;

D.     Award punitive damages to the City in an amount to be determined by the jury that would punish Wells Fargo for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1) and California Government Code § 12989.2;

E.     Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2) and California Government Code § 12989.2;

F.     Require payment of pre-judgment interest on monetary damages; and

G.     Order such other relief as this Court deems just and equitable.

//

//

Dated: February 23, 2018          SACRAMENTO CITY ATTORNEY

By: (-) *Matthew Ruyak*
    Matthew Ruyak

Dated: February 23, 2018          PERETZ & ASSOCIATES

By: (-) *Yosef Peretz*
    Yosef Peretz

Dated: February 23, 2018          TRIAL & APPELLATE RESOURCES, P.C.

By: (-) *Joel Liberson*
    Joel Liberson

Dated: February 23, 2018          CENTER FOR CONSTITUTIONAL LITIGATION

By: (-) *Robert S. Peck*
    Robert S. Peck
    (*pro hac vice forthcoming*)