1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CITY OF SACRAMENTO,                            No. 2:18-cv-00416-KJM-GGH

12                  Plaintiff,

13          v.                                      ORDER

14   WELLS FARGO & CO.; WELLS FARGO
     BANK, N.A.,
15
                    Defendants.
16

17

18          The City of Sacramento ("the City") sues Wells Fargo & Co. and Wells Fargo Bank,

19   N.A. (collectively "Wells Fargo"), alleging Wells Fargo has for more than a decade engaged in a

20   pattern or practice of discriminatory mortgage lending in violation of the federal Fair Housing Act

21   and California's Fair Employment and Housing Act.  For the following reasons, the court GRANTS

22   in part and DENIES in part Wells Fargo's motion to dismiss.

23   I.     BACKGROUND

24          Against the backdrop of "[m]ajor banks['] . . . long history of engaging in redlining

25   throughout Sacramento[,]" the City alleges that since at least 2004, Wells Fargo has maintained a

26   pattern and practice of discriminatory lending in Sacramento that constitutes redlining and reverse

27   redlining.  Compl., ECF No. 1, ¶¶ 9−11 (footnotes omitted).  While "[r]edlining is the practice of

28   denying credit to particular neighborhoods based on race," reverse redlining involves "steering

1

minority borrowers . . . into higher cost or more onerous mortgage loans with discriminatory terms when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers." *Id.* ¶¶ 9, 10 n.5, 11. Further, although Wells Fargo extends credit to white borrowers seeking to refinance, it has a policy of refusing to extend such credit to minority borrowers attempting to refinance their more expensive loans. *Id.* ¶ 5. The City alleges Wells Fargo's conduct amounts to both intentional discrimination and disparate impact discrimination, and that both redlining and reverse redlining violate the Fair Housing Act, 42 U.S.C. §§ 3601, et seq., ("FHA"). *Id.* ¶¶ 8, 11; *see* 42 U.S.C. §§ 3604(b),[1] 3605(a).[2]

The City identifies multiple nationwide, facially neutral Wells Fargo business practices and policies and omissions that allegedly created artificial, arbitrary and unnecessary barriers to fair housing opportunities for minority purchasers and owners. Compl. ¶¶ 47−48, 60. The City provides accounts from "Confidential Witnesses," former Wells Fargo employees responsible for making or underwriting Wells Fargo loans in Sacramento, to bolster its allegations regarding Wells Fargo's discriminatory policies and practices. *Id.* ¶ 34. According to these witnesses, Wells Fargo loan officers "intentionally steered minority borrowers into higher cost loans because of their race or ethnicity," and "used race as a factor in determining which loan products to offer borrowers, what interest rates to charge, and whether to use certain devices and options such as 'lender credits.'" *Id.* ¶¶ 35, 36. According to one witness, for example, a Wells Fargo sales manager instructed loan officers to provide prospective borrowers with different sales

---

[1] Under the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

[2] Under 42 U.S.C. § 3605(a),

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

pitches depending on the neighborhood where the home was located. *Id.* ¶ 37. That same manager instructed officers meeting with borrowers in minority neighborhoods to offer lender credits that would increase the cost of a loan but "make the loan go through," without requiring officers to explain the added expense of the credits to the borrowers. *Id.* ¶¶ 38, 51. Another witness claims his branch manager and loan officers made comments "consistent with racial profiling," and, "if a borrower had a Mexican name, loan officers were likely to exercise their discretion to charge a higher rate and issue a more expensive loan to make up for a discount given to non-minority borrowers." *Id.* ¶ 40; *see id.* ¶¶ 47.a., 53 (alleging officers were pressured to use their discretion in ways that resulted in discriminatory loans). A third witness contends that although Wells Fargo provided marketing materials in Spanish to target Spanish-speaking borrowers, it did not provide mortgage disclosures in Spanish, "even when [the borrower] did not read and write in English and the transaction was handled in Spanish." *Id.* ¶ 43. Because of a shortage of Spanish-speaking employees, Spanish-speaking borrowers were "served by non-Spanish-speaking loan officers 'more often than not'" and entered into loans they did not understand. *Id.* ¶¶ 42, 45−46.

The City alleges its statistical analysis of Wells Fargo loan data, which controls for borrowers' credit history and other factors, bears out its allegations. *Id.* ¶¶ 16, 80−81. The City's analysis of loan data from 2004 through 2016 indicates an African American borrower in Sacramento was 2.043 times more likely to receive high cost or high-risk loans than a similarly situated white borrower. *Id.* ¶ 81. An African American borrower in Sacramento with a FICO score[3] over 660[4] was 2.820 times more likely than a comparable white borrower to receive a costly or risky loan. *Id.* ¶ 82. The City's analysis of loans issued to Latino borrowers reveals similar trends: a Latino borrower in Sacramento was 1.444 times more likely than a comparable white

---

[3] Although not defined in the complaint, "FICO" refers to Fair Isaac Corporation and "FICO score" refers to "credit scores that characterize[] consumer financial creditworthiness. . . . composed of aggregated credit data, provided by a credit bureau, and a credit-scoring algorithm provided by FICO." *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1143 (8th Cir. 2011).

[4] According to the complaint, a FICO score exceeding 660 "indicat[es] good credit." Compl. ¶ 90.

borrower to receive a high risk or high cost loan, and 1.767 times more likely than a comparable white borrower to receive such a loan despite having a 660+ FICO. *Id.* ¶¶ 81−82. Of Wells Fargo's loans to African American and Latino borrowers throughout this period, 7.2 percent were high cost loans. *Id.* ¶ 83. Only 3.8 percent of loans to white borrowers were high cost. *Id.* When the racial makeup of a borrower's neighborhood rather than the borrower's race is analyzed, borrowers in predominantly minority Sacramento neighborhoods were more likely to receive high risk and high cost loans than borrowers in predominantly white neighborhoods; specifically, borrowers in an area with at least 50 percent African American or Latino households were 1.758 times more likely to receive a discriminatory loan than those residing in non-minority areas. *Id.* ¶ 82.

The City also contends Wells Fargo's discriminatory lending practices directly cause foreclosures. According to the City's analysis, a discriminatory loan is 1.424 times more likely than a non-discriminatory loan to result in foreclosure, owing to higher costs and risks. *Id.* ¶¶ 81, 99−101. Although 17.4 percent of Wells Fargo loans in majority African American or Latino neighborhoods in Sacramento end in foreclosure, only 7.2 percent of Wells Fargo loans in majority white neighborhoods do, making foreclosure 2.728 times more likely in minority neighborhoods. *Id.* ¶¶ 93, 98. Further, Wells Fargo's discriminatory loans allegedly end in foreclosure sooner than its loans to white borrowers do. *Id.* ¶ 96 (alleging Hispanic borrowers have an average of 3.566 years before foreclosure while white borrowers have an average 3.8666 years). Because foreclosures reduce property values and make refinancing more difficult and unlikely for the foreclosed properties' neighbors, the City contends Wells Fargo's practices "creat[ed] a downward spiral that magnifies the effects of the discrimination" in particular neighborhoods. *Id.* ¶ 94. Moreover, the City alleges Wells Fargo refused to extend credit to minority borrowers attempting to refinance their discriminatory loans or agreed to refinance such loans only on terms less favorable than those offered to similarly situated white borrowers. *Id.* ¶¶ 13, 99−100.

The City seeks relief for its noneconomic and economic injuries under the FHA and the California Fair Employment and Housing Act ("FEHA"), California Government Code

section 12900, et seq. *Id.* ¶¶ 157–81.[5]  Among its noneconomic injuries, the City alleges its policy goal of enabling "any person to choose where to live in the City" has been adversely affected, as have the "social and professional benefits of living in an integrated society." *Id.* ¶ 114.  To that end, the City's efforts "to encourage racial and economic integration, fair housing, and the elimination of discrimination," which the City has pursued through its agencies, coordination with local nonprofits, grant programs and commissions, have been harmed.  *Id.* ¶¶ 115−19.  The City's alleged economic injuries include (a) the decreased value of foreclosed properties and (b) the decreased value of properties surrounding foreclosed properties, both of which reduce the City's property tax revenues.  *Id.* ¶¶ 120, 122−40; *id.* Ex. A (sample of foreclosed Sacramento properties secured by allegedly discriminatory Wells Fargo loans with gross assessment over time).  Further, the City alleges its costs of remedying blight, unsafe and dangerous conditions at foreclosed properties has injured the City economically and has forced the City to abandon funding for important programs.  Compl. ¶¶ 120−21, 141−51.  The City seeks declaratory and injunctive relief and damages.  *Id.* at 52 (prayer for relief).

Wells Fargo moves to dismiss, Mot., ECF No. 16, the City opposes, Opp'n, ECF No. 22, and Wells Fargo filed a reply, Reply, ECF No. 23.  The court submitted the motion after hearing, ECF No. 28 (hearing minutes), and resolves it here.

II.    LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although "detailed factual allegations" are not required at the pleading stage, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the complaint must contain more than conclusory or formulaic recitations of elements, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  The complaint must contain "sufficient factual matter" to make the alleged claim at least plausible.  *Iqbal*, 556 U.S. at 678; *see Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982) ("Vague and conclusory

---

[5] Although the City's complaint includes a claim for unjust enrichment, *see id.* ¶¶ 182–86, it has since abandoned that claim.  *See* ECF No. 19 (stipulation withdrawing unjust enrichment claim).

allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss."). Aside from external facts properly subject to judicial notice, the court restricts its analysis to the face of the complaint, construing the complaint in plaintiff's favor and accepting well-pled factual allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted).

Under Rule 15 "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation and internal quotation marks omitted). Before granting leave to amend, a court considers any undue delay, bad faith, dilatory motive, futility or undue prejudice posed by allowing the amendment. *Id.* at 1051–52 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Potential undue prejudice to the opposing party "carries the greatest weight," *id.* at 1052, and "[t]he party opposing amendment bears the burden of showing prejudice," *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). Absent prejudice, there is a strong presumption in favor of granting leave to amend. *Eminence Capital*, 316 F.3d at 1052.

III. DISCUSSION

Wells Fargo argues this case should be dismissed without leave to amend because the City cannot meet the "insurmountable pleading-stage barrier" the Supreme Court articulated in *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1305 (2017). Mot. at 8. Wells Fargo also argues the City's claims are time-barred. *Id.* The court addresses each argument below.[6]

/////

/////

---

[6] The court need not independently analyze the City's FEHA claim, the standards for which track FHA standards. *See City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 3008538, at *2 n.2 (N.D. Cal. June 15, 2018), *motion to certify appeal granted*, No. 15-CV-04321-EMC, 2018 WL 7575537 (N.D. Cal. Sept. 5, 2018). In the Oakland case, Wells Fargo's interlocutory appeal is currently pending before the Ninth Circuit, with the City of Oakland's responding brief due September 4, 2019. *City of Oakland v. Wells Fargo & Co.*, No. 19-15169 (9th Cir. Mar. 26, 2019), ECF No. 25. The parties notified the court of the appeal but did not request a stay of this action pending its resolution.

A.     Proximate Cause & *City of Miami*

In *City of Miami*, addressing factually similar claims,[7] the Court considered the causation issue raised here: "Did the Banks' allegedly discriminatory lending practices proximately cause the City to lose property-tax revenue and spend more on municipal services?" *City of Miami, Fla.*, 137 S. Ct. at 1305.  The Eleventh Circuit had answered in the affirmative, holding that, although there were several links in the causal chain, the City plausibly alleged its financial injuries were the foreseeable result of the Banks' alleged misconduct. *Id.* at 1305−06 (citing *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1282 (11th Cir. 2015), *vacated and remanded sub nom. City of Miami*, 137 S. Ct. 1296).  The Court rejected this foreseeability-only approach. *Id.*  Noting "[t]he housing market is interconnected with economic and social life," the Court reasoned that FHA violations may "'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct." *Id.* at 1306 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534 (1983)).  But "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel." *Id.*  Thus, "[i]n the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires." *Id.* at 1306.

Rather, because claims for damages under the FHA are akin to common law torts, Congress intended FHA claims to meet common law proximate causation requirements.  *Id.*  Accordingly, "proximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992)).  Further, although this "directness principle" generally cabins causation to "the first step," "[w]hat falls within that 'first step' depends in part on the nature of the statutory cause of action," as well as "an assessment of what is administratively possible and convenient." *Id.* (citations and internal quotation marks omitted).  The Court declined "to draw the precise boundaries of proximate cause under the FHA and to determine on which side of the line the City's financial injuries fall," leaving that assessment, in the first instance, to the lower courts. *Id.*

---

[7] Wells Fargo describes the City's complaint here as "nearly identical" to the complaint at issue in *City of Miami*.  Mot. at 6.

B.    Applying *City of Miami*

Guided by *City of Miami*, this court must determine whether the City has pled the necessary causal relationship between Wells Fargo's alleged FHA violations on the one hand and the City's alleged injuries on the other.  Put differently, the question is whether the City's alleged injuries are too many "ripples" removed from the precipitating FHA violation to establish "some direct relation between the injury asserted and the injurious conduct alleged."  *See City of Miami*, 137 S. Ct. at 1306 (citing *Holmes*, 503 U.S. at 268).  Although the Court left "the precise boundaries of proximate cause under the FHA" undefined, *see id.,* this court does not begin with a blank slate. Rather, it draws on several foundational cases relied on in *City of Miami* as well as the decisions of several district court and one circuit court applying *City of Miami* in similar cases.

In the first of the foundational cases cited in *City of Miami*, the defendant's alleged RICO violation,[8] stock market fraud, could not be sufficiently tied to the alleged injury of plaintiff Security Investor Protection Corporation ("SIPC"),[9] namely its money paid to customers, without impermissibly reaching "beyond the first step" of proximate causation.  *Holmes*, 503 U.S. at 271−72.  SIPC's chain of causation included at least the following steps: (1) defendants' fraud caused stock prices to drop, which (2) created financial difficulties for registered broker-dealers, which (3) prevented the broker-dealers from meeting their obligations to their customers, including customers who never purchased manipulated securities, which (4) caused the nonpurchasing

---

[8] Plaintiffs sued under RICO's provision for civil actions, providing:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).  Because this provision was modeled on § 4 of the Clayton Act, which in turn borrowed from § 7 of the Sherman Act, which had been read "to incorporate common-law principles of proximate causation," proximate cause was also required to establish a claim under § 1964.  *Holmes*, 503 U.S. at 267−68.

[9] SIPC is a private nonprofit charged with seeking liquidation of its broker-dealer members' businesses and advancing SIPC funds if necessary to satisfy a shortage when a member is unable to meet its obligations to customers.  *Holmes*, 503 U.S. at 261.

broker-dealers' customers to seek reimbursement from SIPC. *Id.* This extended causal chain foreclosed "some direct relation" between the defendant's alleged fraud and harm to the broker-dealers' nonpurchasing customers, because "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271. Acknowledging Congress's directive that "RICO be 'liberally construed,'" the Court found "nothing illiberal" in concluding proximate cause was lacking where, had the stocker-brokers' nonpurchasing customers sued, "the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets"; where the court would be called on "to find some way to apportion the possible respective recoveries by the broker-dealers and the customers, who would otherwise each be entitled to recover the full treble damages"; and where the broker-dealers could, and in fact had through trustees, brought their own suit. *Id.* at 272–73.

Applying *Holmes*, the Court has found proximate cause lacking in other civil RICO cases as well. In *Anza v. Ideal Steel Supply Corporation*, for example, the plaintiff alleged its competitor's practice of not charging cash-paying customers state sales tax and submitting fraudulent tax returns to the state constituted a racketeering scheme to "gain[] sales and market share at [plaintiff's] expense." 547 U.S. 451, 454 (2006). While plaintiff successfully "assert[ed] it suffered its own harms" in the form of lost business as a result of defendant's charging lower prices, defendant's charging lower prices was "entirely distinct from the alleged RICO violation (defrauding the state)." *Id.* at 458. The absence of proximate cause was clear in light of "[t]he attenuation between the plaintiff's harms and the claimed RICO violation" where the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud" and a court "would need to begin by calculating the portion of [defendant's] price drop attributable to the alleged pattern of racketeering activity." *Id.* at 458–59 ("It may have received a cash inflow from some other source or concluded that the additional sales would justify a smaller profit margin. . . . Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices . . . ."). *Id.* Similarly, plaintiff could have lost sales as a result of "factors other

9

than [defendant's] alleged acts of fraud," portending "a complex assessment to establish what portion of [plaintiff's] lost sales were the product of [defendant's] decreased prices." *Id.* at 459. Moreover, "the immediate victim[]" of defendant's alleged RICO violation, the state, could be expected to pursue its own case against defendant. *Id.* at 460. Thus, as to "whether the alleged violation led directly to the plaintiff's injuries . . . . the answer [was] no." *Id.* at 461.

In *Lexmark*, by contrast, the Court determined the proximate cause pleading requirement was satisfied despite an indirect causal chain. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Lexmark manufactured printers and toner cartridges, designed its printers to work exclusively with its style of cartridges, introduced a shrinkwrap notice to incentivize consumers to return empty cartridges to Lexmark for a discount on new cartridges, and developed a microchip that essentially locked a used cartridge until it was returned to and unlocked by Lexmark for refurbishment and resale. *Id.* at 120−21. Static Control made and sold Lexmark-mimicking cartridges and microchips, which it sold to remanufacturers. *Id.* Those remanufacturers then used Static Control's Lexmark-mimicking microchips to unlock, refurbish and resell Lexmark cartridges, directly competing with Lexmark. *Id.* at 121−22. When Lexmark sued Static Control for copyright violations, Static Control counterclaimed for violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleging Lexmark falsely or misleadingly advised (1) consumers they were "legally bound" to return used cartridges directly to Lexmark and (2) remanufacturers "it was illegal to use Static Control's products to refurbish [and sell Lexmark] cartridges." *Id.* at 123.

Recognizing Static Control's injuries were only indirectly linked to Lexmark's alleged "consumer confusion" and necessarily "include[d] the intervening link of injury to the remanufacturers," the Court nonetheless found Static Control sufficiently alleged Lexmark's misrepresentations proximately caused Static Control's injuries. *Id.* First, because the Lanham Act prohibits consumer confusion, Static Control's "injury flows directly from the audience's belief in the disparaging statements." *Id.* at 138. Second, because Static Control's microchips were necessary for and had no use other than refurbishing Lexmark toner cartridges, Static Control alleged "something very close to a 1:1 relationship" between the harm suffered by the

remanufacturers and the harm suffered by Static Control. *Id.* at 139 (internal quotation marks omitted) (quoting *Holmes*, 503 U.S. at 271). Put differently, "if the remanufacturers sold 10,000 fewer refurbished cartridges because of Lexmark's false advertising, . . . Static Control sold 10,000 fewer microchips for the same reason, without the need for any 'speculative . . . proceedings' or 'intricate, uncertain inquiries.'" *Id.* (quoting *Anza*, 547 U.S. at 459−60). Accordingly, "the remanufacturers [were] not 'more immediate victim[s]' than Static Control." *Id.* (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008)).

Here, the court draws on these cases in resolving Wells Fargo's motion, paying close attention to the nature of the FHA and the "discontinuity" and "directness" concerns that typically cabin proximate cause to the first step. For the reasons explained below, the court largely rejects Wells Fargo's challenge to the City's pleadings.

### 1. The City's Alleged Economic Injuries – Tax Revenues

Here, as in *City of Miami*, the City seeks money damages for "reduced property tax revenues resulting from (a) the decreased value of the vacant properties themselves, and (b) the decreased value of properties surrounding the vacant properties." Compl. ¶ 120; *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1282 (11th Cir. 2019) (hereafter *Miami on Remand*). Further, the City alleges it "[r]outinely maintained property tax and other data [that] allow for calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures." Compl. ¶ 132; *City of Miami on Remand*, 923 F.3d at 1283.

### a. First Step

Wells Fargo first argues the court cannot find the alleged FHA violations proximately caused the City's alleged economic injuries without impermissibly stretching the causal chain beyond the first step, contending the City's injuries are "at least five steps removed from the challenged loans made to residents at the beginning of the chain." Mot. at 15−16 (emphasis omitted). Two courts have rejected similar arguments with reasoning this court finds

/////

/////

/////

11

persuasive.  *See City of Miami on Remand*, 923 F.3d at 1273; *City of Oakland, N.A.*, 2018 WL 3008538, at *8.[10]

In *City of Miami*, on remand from the Supreme Court, the Eleventh Circuit found "intervening steps in a causal chain cannot automatically and invariably end the analysis" and rejected as too "wooden" the Banks' proffered rule that the City of Miami could not establish proximate cause because the City's injuries fell outside the first step.  *City of Miami on Remand*, 923 F.3d at 1274−75.  Noting that, had Supreme Court found "more than a single step" in a causal chain prevented a party from establishing proximate cause, "there would have been no reason for the Supreme Court to remand this case back to our Court for further proximate cause analysis." *Id.* at 1276; *City of Oakland*, 2018 WL 3008538, at *8 ("[W]hile Oakland's injuries are several steps removed from WF's conduct, that fact does not appear to be determinative.  Similar facts were present in *Miami*, yet . . . the Supreme Court remanded the case instead of simply holding there was no proximate cause as matter of law.").  As these courts observed, the "'general tendency' to stop at the first step" in a proximate causation analysis cannot be treated as "an inexorable rule," as Wells Fargo urges here.  *See City of Miami on Remand*, 923 F.3d at 1276.

The Eleventh Circuit then turned to the banks' proffered causal chain, which, as with Wells Fargo's proposed chain of causation here, attempted to introduce doubt regarding whether the alleged FHA violations led to foreclosures as opposed to "the variety of factors that we worry might independently explain a homeowner's foreclosure (like the loss of a job or spiking health care costs)." *Id.* at 1277; *see* Mot. at 16−18 (identifying first step in causal chain as "defaults because of alleged discriminatory payment differentials (as opposed to some other reason, such as unemployment, illness, or divorce)" and arguing "these independent actors and variables entered the scene long after Wells Fargo had made its loan").  As the Eleventh Circuit explained, these independent explanations

> all occur at the front end of the step-counting, between the act or acts of redlining and the foreclosure, not later.  Once we have reached increased foreclosures on a neighborhood or citywide basis, it seems to us that the path to the City's substantially decreased tax base is

---

[10] *See* note 4 *supra* for full cite and status of *City of Oakland* case, which is on appeal.

12

> clear, direct and immediate; we can discern no obvious intervening roadblocks. Virtually all the independent variables posited by the Banks occur before foreclosure. We can identify the same kind of continuity here as in *Lexmark*: if the Banks' predatory lending practices injured homeowners and led to foreclosures on a massive scale, these injuries inflicted on multiple homeowners in the same city must almost surely have injured the City as well. There is no discontinuity in this portion of the causal chain. Thus, since the risks of multiple independent variables after foreclosure are not likely, and are not many, even if we were to count steps in the way the Banks have suggested, the principles animating the general first-step rule do not support the Banks' calculation of the post-foreclosure causal chain.

*City of Miami on Remand*, 923 F.3d at 1277–78. Moreover, taking the complaint's allegations as true as required at the pleading stage and disregarding the Banks' attempt "to identify as many steps as possible" regardless of the complaint's allegations, the Eleventh Circuit concluded it "might just as easily place the same injury at the second or third step: First, a bank extends predatory loans in violation of the FHA. Second, homeowners default. Third, the bank forecloses and the property values plummet, necessarily reducing the City's tax base and injuring its fisc." *Id.* at 1278. Noting "[t]he chain will be shorter still if struggling homeowners sought to refinance and then faced swift foreclosures when fair terms were not extended," an allegation the banks in *City of Miami* ignored as does Wells Fargo here, the Eleventh Circuit concluded: "At the very least, the ease with which we can count far fewer steps reinforces our view that step-counting is of limited value and cannot alone settle the challenging questions of proximate cause here." *Id.* at 1276, 1278.

Ultimately, the "first step" is a flexible concept, shaped in part by "the nature of the statutory cause of action." *See City of Miami*, 137 S. Ct. at 1306 (quoting *Lexmark*, 572 U.S. at 133). As the Eleventh Circuit's analysis of the FHA's text and history confirmed, the FHA's "broad remedial purpose . . . is perfectly capable of accommodating the type of aggregative causal connection that the City has identified between the Bank's alleged misconduct and financial harm to Miami." *City of Miami on Remand*, 923 F.3d at 1278. Citing the FHA's enactment in a time of great social unrest, the court explained, "Congress explicitly took aim at these broad social ills— maladies that were being felt on a citywide scale" and "its sponsors quite specifically referenced harm to a city's tax base, arising out of discrimination in the housing market." *Id.* at 1280. Given the FHA's expansive text and purpose, and putting aside "issues of proof that might arise later in

13

litigation," there is "no reason to think as a general matter that the City's claims are out of step with the 'nature of the statutory cause of action' and the remedial scheme that Congress created." *Id.* at 1280–81. The court reaches the same conclusion here.

Accordingly, the court rejects Wells Fargo's first step argument.

b. Derivative Harms to Third Parties

Wells Fargo next argues the City's injuries are purely derivative of and contingent on harms suffered by third parties: the borrowers who received Wells Fargo's allegedly discriminatory loans. Mot. at 17. This argument appears to draw on the *Holmes* Court's skepticism regarding the feasibility of apportioning recovery where other potential plaintiffs, including the broker-dealers and their customers, in addition to SIPC, could seek "to recover the full treble damages" available in a civil RICO action. 503 U.S. at 272–73.

The Eleventh Circuit rejected a similar argument concerning the purportedly derivative nature of the City of Miami's harm. *City of Miami on Remand*, 923 F.3d at 1286−87. There, the court explained, "the City's injuries are unique to its treasury, no other plaintiff will plead the same injuries, or attempt to recover the same funds." *Id.* at 1281, 1287. While individual homeowners harmed by the discriminatory loans may bring FHA claims to recover a host of damages and equitable relief, "no court could allow a homeowner to recover for harm to a city's treasury." *Id.* at 1287.

Here, the court finds the City has alleged a distinct injury that is unique from that suffered by individual homeowners. It therefore rejects Wells Fargo's argument that the City's claims are wholly derivative of borrower's injuries and that the risk of duplicative recovery prevents the City from establishing causation here. *See id.* ("Even if we were to assume that each victim of discrimination were to successfully bring an individual claim [--] a wholly implausible hypothesis—the City would still have an independent set of claims based on the independent harm that it suffered."); *see also City of Oakland*, 2018 WL 3008538 ("Oakland's injuries are distinct and different from those suffered by the minority borrowers. . . . recovery by Oakland would not threaten double compensation for the same injury."). Notably, the case before this court is not a case where the City's injuries are "entirely distinct" from the alleged violation, so as to break the

14

causal chain.  *See Anza*, 547 U.S. at 458 (plaintiff's lost business resulting from defendant's charging lower prices was "entirely distinct" from defendant's alleged violation, "defrauding the state").  As other courts have found, the underlying alleged FHA violation gives rise to injuries both to the City and the individual borrowers, and those injuries are unique and uniquely capable of vindication under the FHA.

Therefore, the court rejects Wells Fargo's derivative harms argument.

c.    Complex Damages Litigation

Wells Fargo also argues dismissal is warranted to avoid "massive and complex damages litigation" requiring no fewer than five sets of "mini-trials on every single loan and property" to reach a verdict in this case.  Mot. at 19−20.  Attempting to head off the City's reliance on its statistical analysis, Wells Fargo argues that such analysis cannot possibly "establish[] a direct causal connection between the origination of the challenged loans (or even foreclosures of challenged loans) and the City's alleged lost tax revenue . . . injuries." *Id.* at 20.  In other words, Wells Fargo argues it is neither "administratively possible [nor] convenient" to establish causation here. *See City of Miami*, 137 S. Ct. at 1306 (quoting *Holmes*, 503 U.S. at 268).

At this juncture, the court rejects Wells Fargo's claim that this case cannot proceed without multiple mini-trials, a speculative position Wells Fargo advances with no support. *See City of Oakland*, 2018 WL 3008538, at *8 ("[T]he injury here is not individualized; it is aggregative; where damages are aggregative, precision is not expected.").  Moreover, while Wells Fargo attempts to discredit the City's regression analysis as insufficient, the complaint alleges a robust analysis derived from reliable data that suffices, at least at the pleading stage, to establish the necessary causal connection.  *See id.* ("Because statistical analysis plausibly can permit the calculation of Oakland's property-tax injury caused by WF's policies with some reasonable certainty, the first factor supports proximate cause, at least at the pleading stage.").

Indeed, here, as in *City of Miami*, the City alleges that "[r]outinely maintained property tax and other data allow for calculation of the property tax revenues lost by the City as a direct result of particular Wells Fargo foreclosures."  Compl. ¶ 132; *City of Miami on Remand*, 923

F.3d at 1282 (same).  The City alleges it relies on its Hedonic regression methodology[11] to "quantify the property tax injury to the City directly caused by Wells Fargo's discriminatory lending practices and resulting foreclosures in minority neighborhoods."  Compl. ¶ 139; *City of Miami on Remand*, 923 F.3d at 1282 (same).  The City describes its analytical approach in detail, explaining its data combined with these well-established statistical techniques will allow the City to "isolate the lost property value attributable to Wells Fargo foreclosures and vacancies caused by discriminatory lending from losses attributable to other causes, such as neighborhood conditions."  Compl. ¶ 132; *City of Miami on Remand*, 923 F.3d at 1283 (same).

These allegations provide "a clear idea of the final analysis—based on empirical data drawn from thousands of housing transactions, the City will calculate the impact of the Banks' foreclosures on property values in redlined (and reverse-redlined) areas of [Sacramento] controlling for other variables and isolating the impact of the redlining."  *See City of Miami on Remand*, 923 F.3d at 1283.  Because the City alleges its Hedonic analysis is capable of linking Wells Fargo's alleged misconduct with increased foreclosures and also linking increased foreclosures to decreased property taxes, the analyses will plausibly allow the court to calculate the property-tax injury attributable to Wells Fargo's conduct "with some reasonable certainty," reducing if not obviating *Holmes*' discontinuity concerns.  *See City of Oakland*, 2018 WL 3008538, at *9; *see also City of Miami on Remand*, 923 F.3d at 1284 ("Even if each individual act of redlining does not bear a one-to-one proportional relationship to Miami's loss of tax revenue, . . . since intervening circumstances affect which individual properties go into foreclosure, in the aggregate it has been plausibly alleged that the impact of redlining and reverse-redlining can be identified with precision and deterred." (citing *Lexmark*, 134 S. Ct. at 1394)).

It may well be that a "battle of experts" concerning the City's statistical analysis will ultimately arise, but for now "[t]he complaints' allegation that regression analysis can pinpoint

---

[11] The City describes Hedonic regression as "a well-established statistical regression technique that focuses on effects on neighboring properties," that, "when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions" and" determines the contribution of each of these house and neighborhood characteristics to the value of a home."  Compl. ¶ 132.

16

causation" suffices here. *Id.* at 1283–84. Finally, the court rejects Wells Fargo's argument based on complexity: "the federal courts regularly handle complex and high-stakes cases, so complexity alone is no reason to dismiss a case on the pleadings." *Id.* at 1281.

### d. Conclusion

Insofar as Wells Fargo moves to dismiss the City's claims of alleged economic injuries arising from reduced property tax revenues, the motion is DENIED.

### 2. The City's Alleged Economic Injuries – Municipal Services

The City also seeks recovery for the "increased [] cost of providing municipal services such as police, fire fighting and code enforcement," incurred "to remedy blight and unsafe and dangerous conditions which exist at properties that were foreclosed as a result of Wells Fargo's illegal lending practices." Compl. ¶¶ 7, 121, 141−51. The City alleges its increased municipal "services would not have been necessary if the properties had not been the subject of Wells Fargo's discriminatory mortgage practices." *Id.* ¶ 141. Moreover, according to the City, "violent crime has generally been found to increase due to foreclosures." *Id.* ¶ 143. By way of example, the City contends its fire and police departments, code enforcement officers and City Attorney's Office regularly respond to problems at foreclosed properties, including "vagrancy, criminal activity, fire hazards and threats to public health and safety" as well as "burglaries . . . , armed robbery, public intoxication, drug sales and possession [of drugs] . . . , vehicle theft, break-in, or abandonment, vagrancy, home squatters, and prostitution and lewd conduct." *Id.* ¶¶ 143−44, 149. In light of the increased services required at the location of foreclosed properties, the City alleges its police and fire departments and other officials are "strain[ed]" and dedicate "a disproportionate amount of resources to manage the problem," directing resources away from other City needs. *Id.* ¶¶ 142, 147.

Other courts have found equivalent claims made by other cities, arising from their provision of municipal services, rely on conclusory allegations and a foreseeability-only theory without establishing proximate cause. This court agrees with that conclusion given the nature of the pleadings here. As the Eleventh Circuit concluded, these allegations purport to identify actions the City was "required" to take in light of foreclosures without establishing "any direct connections

[] between the foreclosure and any of these expenditures" and without providing any "explanation of how the City will identify the amount of increase attributable to the foreclosures or to the Banks' conduct." *City of Miami on Remand*, 923 F.3d at 1286; *City of Oakland*, 2018 WL 3008538, at *9 (contrasting property tax revenues claim, for which Oakland had plausibly alleged it could calculate damages "with some reasonable certainty" with the "municipal-expenditure injury, for which Oakland has proffered no statistical analysis"). As Wells Fargo argues, these allegations also expressly rely on third parties' conduct following foreclosure, extending the causal chain and making proper attribution of damages more difficult. *See* Mot. at 18 ("After the vacancies . . ., this theory requires . . . illegal acts by squatters, vandals, or other criminals, who congregated in or near the empty homes."); *City of Miami on Remand*, 923 F.3d at 1285 ("Intervening causes and independent variables will inevitably run up this measure of damages because the City's expenditures occur at some obvious level of remove from the foreclosures that it says cause them. They are further down the chain, to put it in step-counting terms.").

In *City of Oakland*, the court dismissed claims arising from Oakland's municipal services injury only insofar as those claims sought damages, finding "Miami's directness requirement . . . does not appear to extend to claims for injunctions or declaratory relief." 2018 WL 3008538, at *10; *see also City of Miami*, 137 S. Ct. at 1306 (observing, "[a] damages claim under the [FHA] 'is analogous to a number of tort actions recognized at common law'" and the Court "ha[s] repeatedly applied directness principles to statutes with 'common-law foundations,'" with "'[t]he general tendency' in these cases, 'in regard to damages at least, [being] not to go beyond the first step'") (citations omitted)). Whether "the proximate-cause requirement articulated in *City of Miami* [is] limited to claims for damages under the FHA and not to claims for injunctive or declaratory relief" was certified for appeal and is pending before the Ninth Circuit. *See City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 7575537, at *2 (N.D. Cal. Sept. 5, 2018). Here, Wells Fargo persuasively argues the proximate cause requirement must be satisfied to state a claim under the FHA, regardless of the relief sought. *See* Reply at 12 n.10 (arguing "*City of Miami* is clear that direct proximate cause is an 'element' of an FHA claim" and "[p]roximate cause focuses on the injuries asserted—*not* the form of relief sought") (citing *City of*

*Miami*, 137 S. Ct. at 1305; *Lexmark*, 134 S. Ct. at 1390) (original emphasis); Transcript, ECF No. 32, at 8:13−18. Accordingly, as to the City's municipal services injuries, for all forms of relief sought, the motion is GRANTED but with leave to amend if possible subject to Federal Rule of Civil Procedure 11.

Accordingly, as to the City's municipal services injuries seeking damages the motion is GRANTED with leave to amend.

C.      Non-Economic Injuries

The City also alleges it has suffered non-economic injuries resulting from Wells Fargo's allegedly discriminatory lending. Compl. ¶¶ 25, 111, 114−19. The City's goals include "assur[ing] that racial factors do not adversely affect the ability of any person to choose where to live in the City or to detract from the social and professional benefits of living in an integrated society," which the City supports through "fair housing programs offered by local organizations including the Board of Realtors," by "requir[ing] partner banks and lending institutions to invest in the community in a responsible manner" and by operating the Sacramento Housing and Redevelopment Agency ("SHRA"), which "provides funding for development of rental and homeownership housing for low income individuals, and mortgage assistance for first time homeowners for a variety of affordable housing types throughout the City." *Id.* ¶¶ 114−16. The SHRA also coordinates with local nonprofit housing and social services organizations and "funds services for residents impacted by discriminatory housing practices by supporting the Sacramento Self Help Housing and Legal Services of Northern California organizations." *Id.* ¶ 116. The Sacramento Housing and Redevelopment Commission identifies "slum areas" and areas "where there is a shortage of decent, safe, and sanitary dwelling accommodations for persons of low-income" and works with SHRA to plan affordable housing. *Id.* ¶ 117. Finally, the City's Community Development Department plans housing programs and, under the City's Housing Element in its General Plan, furthers the City's goals of creating housing "that is purposeful, inclusive, and reflective of the realities of living in Sacramento in the second decade of the 21st Century." *Id.* ¶ 118 (internal quotation marks omitted). Tying these interests to Wells Fargo's allegedly discriminatory loans, the City alleges, "Wells Fargo's conduct has directly and adversely

19

impacted the ability of minority residents to own homes in the City," *id.* ¶ 114, and "[t]he bank's discriminatory lending practices directly interfere with the City's ability to achieve [its] important objectives," *id.* ¶ 119. *See also id.* ¶ 14 ("[F]oreclosures on loans originated by Wells Fargo are concentrated in neighborhoods with higher proportions of minorities."), ¶ 98 ("Wells Fargo's discriminatory lending practices directly cause foreclosures and vacancies in minority communities in Sacramento").

Wells Fargo appears to question the City's standing to pursue relief for its non-economic injuries and also argues the "proximate cause inquiry must focus on the City's alleged economic injuries, not on any purported 'non-economic' interests." Mot. at 21–22.

To the extent Wells Fargo challenges the City's standing, the court rejects that challenge. Non-economic injuries are generally cognizable under the FHA. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376–77 (1982) (finding injury for loss of social and professional benefits of living in an integrated society); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 111 (1979) (finding village alleged injury in fact in alleging racial steering deprived it of "racial balance and stability");[12] *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209–10 (1972) (finding cognizable injury to apartment tenants for "loss of important benefits from interracial associations"). The Supreme Court reaffirmed *Gladstone* recently, in holding the City of Miami's "allege[d] economic injuries [] arguably fall within the FHA's zone of interests, as we have previously interpreted that statute." *City of Miami*, 137 S. Ct. at 1305. Wells Fargo identifies several court decisions discussing organizational standing and argues the City has not met the applicable standard here. *See* Mot. at 22 (arguing "the City[] fail[ed] to plausibly allege diversion-of-resources damages under *Havens* and controlling Ninth Circuit law"); Reply at 10 n.9 ("[T]he allegations are insufficient to plead organizational diversion-of-resources and frustration-of-mission injuries."). At least one other court addressing claims similar to those in this case

---

[12] In *Gladstone*, decided in the late 1970s, the village alleged defendant real estate brokerage firms engaged in racial steering and thus manipulated the housing market in specific areas of the village. *Gladstone Realtors*, 441 U.S. at 109–10. Specifically, the village alleged that the firms did not show white buyers homes in the affected areas, though some of those buyers "otherwise would purchase homes there," and "falsely le[]d [African American buyers] to believe that no suitable homes within the desired price range [were] available elsewhere in the general area." *Id.*

apparently was persuaded by this argument and held the city had not satisfied organizational standing pleading requirements. *See City of Oakland*, 2018 WL 3008538, at \*11. This court is not convinced, however, that organizational standing requirements apply to a municipality, particularly where precedent establishes municipalities' standing under the FHA to assert the types of claims asserted here. *See Gladstone*, 441 U.S. at 111 ("If, as alleged, petitioners' sales practices actually have begun to rob Bellwood of its racial balance and stability, the village has standing to challenge the legality of that conduct."); *cf. City & Cty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 944 n.3 (N.D. Cal. 2018) (rejecting city's organizational standing argument and noting, "[g]overnment entities and private organizations are not necessarily interchangeable for standing purposes, and therefore it is unclear that a *Havens* analysis is even appropriate here").

Wells Fargo also argues that in *City of Miami*, "[t]he Supreme Court's analysis makes it abundantly clear that this Court's proximate cause inquiry must focus on the City's alleged economic injuries, not on any purported 'non-economic' interests." Mot. at 14 (footnote omitted); *see also id.* ("[T]he Supreme Court has never suggested that 'non-economic harms' might be relevant to the proximate cause analysis of FHA claims like the City's—in fact, just the opposite."). Wells Fargo thus appears to argue that the City can establish its noneconomic injuries were proximately caused by Wells Fargo's misconduct only if the City pleads a causal connection that is economic in nature. This is not self-evident, and Wells Fargo's only support is a highly strained, cursory summary of its reading of *City of Miami*. *See id.* (arguing although Court acknowledged the City of Miami's allegations that its fair housing and integration goals had been frustrated, the Court's proximate cause analysis focused only on financial injuries). Wells Fargo has not developed in any meaningful or persuasive way its argument that proximate cause standards should apply to non-economic FHA injuries, and it is not the court's job to make arguments for a moving party. While the City may face a steep challenge in ultimately establishing that the frustration of its non-economic goals has been proximately caused by Well Fargo's discriminatory loans, the City has sufficiently pled its case in this respect.

Accordingly, as to the City's non-economic injuries, Wells Fargo's motion to dismiss is DENIED.

D.    Statute of Limitations

"When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). Under the FHA, a civil enforcement action must be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). The phrase "or the termination of" codifies the continuing violation doctrine, under which plaintiff may challenge conduct outside of the two-year period if at least one incident involving the alleged misconduct occurred within the limitations period. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982).

Here, the City alleges Wells Fargo has issued discriminatory loans to minority borrowers from at least 2004 through the present and provides four sample loans issued within the two-year period before this suit was filed. Compl. ¶ 155. These allegations suffice to bring the City's case within the statute of limitations and Wells Fargo's motion is DENIED. *See City of Philadelphia v. Wells Fargo & Co.*, No. CV 17-2203, 2018 WL 424451, at *3−4 (E.D. Pa. Jan. 16, 2018); *Cty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 520−21 (N.D. Ill. 2015) (same).

IV.    CONCLUSION

Wells Fargo's motion to dismiss claims alleging economic injury is DENIED as to the City's tax revenues and GRANTED, with leave to amend, as to the City's municipal services to the extent allowed by this order. The court DENIES Wells Fargo's motion to dismiss claims alleging non-economic injury and also DENIES its motion with respects to the statute of limitations argument.

The parties are ORDERED to meet and confer and file a joint status report as to scheduling this matter within fourteen (14) days of this order. Because an appeal concerning the same issues decided here, the result of which will be binding on this court, is pending before the Ninth Circuit, the parties should let the court know whether they believe a stipulated stay is

/////

/////

appropriate.  Should the parties not stipulate to a stay, plaintiff may file an amended complaint within twenty-eight (28) days of this order.

IT IS SO ORDERED.

DATED:  August 22, 2019.

_____
UNITED STATES DISTRICT JUDGE